167 F.3d 641
 48 ERC 1193, 334 U.S.App.D.C. 404, 29
Envtl. L. Rep. 20,631
 ENVIRONMENTAL DEFENSE FUND, on behalf of itself and its
members, Petitioners,
v.
ENVIRONMENTAL PROTECTION AGENCY and Carol M. Browner, in her
capacity as Administrator of the United States
Environmental Protection Agency, Respondents.
 No. 97-1637.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Sept. 3, 1998.
Decided March 2, 1999.
 
 On Petition for Review of an Order of the Environmental Protection Agency.
 Robert E. Yuhnke argued the cause and filed the briefs for petitioner.
 Thomas A. Lorenzen, Attorney, U.S. Department of Justice, argued the cause for respondents. With him on the brief were Lois J. Schiffer, Assistant Attorney General, Karen L. Egbert, Attorney, U.S. Department of Justice, Sara Schneeberg, Attorney, Environmental Protection Agency, and Peter J. Plocki, Attorney, U.S. Department of Transportation.
 Before: WALD, WILLIAMS and TATEL, Circuit Judges.
 Opinion for the Court filed by Circuit Judge TATEL.
 Dissenting opinion filed by Circuit Judge WILLIAMS.
 TATEL, Circuit Judge:
 
 
 1
 Petitioner challenges several provisions of the 1997 Final Rule issued by the Environmental Protection Agency pursuant to the 1990 amendments to the Clean Air Act. That statute prohibits a metropolitan planning organization from approving and the Department of Transportation from funding any transportation project unless it comes from a regional transportation plan and program that conform to applicable state-level air quality standards. Because the challenged "conformity" and "grandfather" regulations allow both local approval and federal funding of transportation projects that satisfy neither this requirement nor the single exception the statute permits, we hold that these regulatory provisions violate the Clean Air Act. In addition, we remand the regulations which allow conformity to be based on emissions budgets unapproved or disapproved by EPA for further proceedings to harmonize those regulations with the statute's general conformity requirements. Finally, we hold that the regulation which allows conformity to be based on revised budgets that include "safety margin" emissions violates the statute's requirement that conformity be evaluated against approved or applicable air quality standards.
 
 
 2
 * The Clean Air Act establishes a joint state and federal program for regulating the nation's air quality. The Act requires EPA to establish National Ambient Air Quality Standards ("NAAQS") for various pollutants. See 42 U.S.C. § 7409 (1994). It also requires each state to adopt a State Implementation Plan (known as a "SIP") that "provides for implementation, maintenance, and enforcement of [NAAQS] in each air quality control region (or portion thereof) within such State." Id. § 7410(a)(1). SIPs must include "enforceable emission limitations and other control measures, means, or techniques ... , as well as schedules and timetables for compliance, as may be necessary or appropriate" to meet the NAAQS. Id. § 7410(a)(2)(A). "[A]fter reasonable notice and public hearings," each state must submit a SIP with such pollution control strategies to EPA. Id. § 7410(a)(1). EPA typically approves SIPs pursuant to notice-and-comment rulemaking.
 
 
 3
 In 1977, Congress amended the Clean Air Act to ensure that transportation planning at the local level conforms to pollution controls contained in approved SIPs. To accomplish this, the 1977 amendments prohibit federal agencies from assisting, approving, or supporting "any [transportation] activity which does not conform to [an applicable SIP]." Pub.L. No. 95-95, tit. I, sec. 129(b), § 176(c), 91 Stat. 745, 750 (1977).
 
 
 4
 Because Congress "offered little guidance" on the 1977 conformity requirement, and because federal agencies "largely ... ignored" it, Clean Air Conference Report, 136 Cong. Rec. 36,103, 36,105-06 (1990), Congress amended the Act again in 1990 to expand the content and scope of this requirement. See Pub.L. No. 101-549, tit. I, sec. 101(f), 110(4), § 176(c), 104 Stat. 2409, 2470 (1990) (codified at 42 U.S.C. § 7506(c)). The focus of this case, the 1990 amendments do two things. First, they establish general criteria for determining whether a transportation activity conforms to a SIP:
 
 
 5
 (1) .... Conformity to an implementation plan means--
 
 
 6
 (A) conformity to an implementation plan's purpose of eliminating or reducing the severity and number of violations of the national ambient air quality standards and achieving expeditious attainment of such standards; and
 
 
 7
 (B) that such activities will not--
 
 
 8
 (i) cause or contribute to any new violation of any standard in any area;
 
 
 9
 (ii) increase the frequency or severity of any existing violation of any standard in any area; or
 
 
 10
 (iii) delay timely attainment of any standard or any required interim emission reductions or other milestones in any area.
 
 
 11
 42 U.S.C. § 7506(c)(1). Heads of federal agencies have "an affirmative responsibility" to assure conformity of any federally assisted or approved activity to an applicable SIP. Id.
 
 
 12
 Second, the 1990 amendments integrate the attainment and maintenance of air quality standards with the specific transportation planning process prescribed by the Urban Mass Transportation Act. As the Clean Air Conference Report put it, "[t]he purpose of the new 'conformity' requirement is to ensure that the transportation systems choices made by the community and incorporated into the regional transportation plan required by [federal transportation statutes] are consistent with achieving the allowable emission targets for each pollutant assigned to mobile sources in the SIP." 136 Cong. Rec. at 36,106 col.2. Under the Urban Mass Transportation Act, the governor of each state, in agreement with local officials, must designate a metropolitan planning organization (known as an "MPO") for each urban area with more than 50,000 people. See 49 U.S.C.A. § 5303(c)(1). The MPO plans for the transportation needs of that area. It develops a long range transportation plan (referred to in the statute as a "plan") which specifies the facilities, services, financing techniques, and management policies that will comprise the area's transportation system over a 20-year period, see id. § 5303(f), as well as a short-term transportation improvement program (referred to in the statute as a "program" and in the regulations as a "TIP") which identifies and prioritizes the specific transportation projects to be carried out over the next three years, see id. § 5304(b). The heart of the Clean Air Act's 1990 conformity requirements consists of the following restrictions on approval and funding of transportation plans, programs, and projects:
 
 
 13
 (2) Any transportation plan or program developed pursuant to Title 23 or the Urban Mass Transportation Act shall implement the transportation provisions of any applicable implementation plan ... applicable to all or part of the area covered by such transportation plan or program. No Federal agency may approve, accept or fund any transportation plan, program or project unless such plan, program or project has been found to conform to any applicable implementation plan in effect under this chapter. In particular--
 
 
 14
 (A) no transportation plan or transportation improvement program may be adopted by a [MPO], or be found to be in conformity by a [MPO] until a final determination has been made that emissions expected from implementation of such plans and programs are consistent with estimates of emissions from motor vehicles and necessary emissions reductions contained in the applicable implementation plan ...;
 
 
 15
 . . . . .
 
 
 16
 (C) a transportation project may be adopted or approved by a [MPO] or any recipient of funds designated under Title 23 or the Urban Mass Transportation Act, or found in conformity by a [MPO] or approved, accepted, or funded by the Department of Transportation only if it meets either the requirements of subparagraph (D) or the following requirements--
 
 
 17
 (i) such a project comes from a conforming plan and program;
 
 
 18
 . . . . .
 
 
 19
 * * *
 
 
 20
 (D) Any project not referred to in subparagraph (C) shall be treated as conforming to the applicable implementation plan only if it is demonstrated that the projected emissions from such project, when considered together with emissions projected for the conforming transportation plans and programs within the nonattainment area, do not cause such plans and programs to exceed the emission reduction projections and schedules assigned to such plans and programs in the applicable implementation plan.
 
 
 21
 42 U.S.C. § 7506(c)(2). According to the Agency, these provisions apply only to "nonattainment" areas (i.e., areas that have not met an air quality standard for a particular pollutant) and to "maintenance" areas (i.e., former nonattainment areas that have met the appropriate standard). See 40 C.F.R. §§ 93.101, 93.102(b) (1998).
 
 
 22
 In addition to specifying general conformity criteria and imposing restrictions on regional transportation planning, the 1990 amendments establish conformity criteria that apply to transportation plans, programs, and projects prior to Agency approval of a submitted SIP. See 42 U.S.C. § 7506(c)(3). The amended Act also authorizes EPA to promulgate criteria and procedures for determining conformity, provided that "in no case shall [conformity] determinations for transportation plans and programs be less frequent than every three years." Id. § 7506(c)(4)(B)(ii).
 
 
 23
 EPA first issued criteria and procedures for making conformity determinations in 1993. See 58 Fed.Reg. 62,188 (1993). It then amended those procedures in a series of rulemakings. See 60 Fed.Reg. 40,098 (1995); 60 Fed.Reg. 57,179 (1995). In recent years, this court has heard two challenges to these amended rules. See Sierra Club v. EPA, 129 F.3d 137 (D.C.Cir.1997) (invalidating one-year exemption from statutory conformity requirements for transportation activities in nonattainment areas); Environmental Defense Fund, Inc. v. EPA, 82 F.3d 451 (D.C.Cir.1996) (upholding various regulations as reasonable interpretations of the statute).
 
 
 24
 In this case, petitioner Environmental Defense Fund argues that various provisions of EPA's most recent Final Rule, see 62 Fed.Reg. 43,780 (1997) (codified at 40 C.F.R. §§ 93.100-93.128), violate the conformity requirements set forth in the 1990 amendments to the Clean Air Act. Specifically, petitioner contends: (1) that section 93.121(a)(1) of the regulations unlawfully permits local authorities to approve transportation projects in the absence of a currently conforming transportation plan and program; (2) that section 93.102(c)(1) suffers from the same defect with respect to federal funding of transportation projects; and (3) that sections 93.118(e)(1), 93.120(a)(2), and 93.124(b) unlawfully require or permit conformity determinations to be based on emissions budgets in SIPs that EPA has disapproved or not yet approved.
 
 
 25
 Applying Chevron's two-step inquiry, we take up each claim in turn. We begin by asking "whether Congress has directly spoken to the precise question at issue." Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). If so, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Id. at 842-43, 104 S.Ct. 2778. However, if "the statute is silent or ambiguous with respect to the specific issue," we must defer to the Agency's construction of the statute as long as it is reasonable. Id. at 843, 104 S.Ct. 2778.
 
 II
 
 26
 We start with EDF's challenge to section 93.121(a)(1) of the regulations, which provides that an MPO or other recipient of federal funds may adopt or approve a regionally significant transportation project if "[t]he project was included in the first three years of the most recently conforming transportation plan and TIP (or the conformity determination's regional emissions analyses), even if conformity status is currently lapsed." 40 C.F.R. § 93.121(a)(1). Conformity status of a transportation plan or program lapses when more than three years pass without a new conformity determination by an MPO or the Department of Transportation. See 42 U.S.C. § 7506(c)(4); 40 C.F.R. § 93.104(b)(3), (c)(3). Under section 93.121(a)(1), local officials may approve a transportation project as long as it once appeared in a conforming plan and program, even if the plan and program no longer conform at the time of project approval. By authorizing this result, petitioner argues, section 93.121(a)(1) violates the Clean Air Act's requirement that projects "come[ ] from a conforming plan and program." 42 U.S.C. § 7506(c)(2)(C). We agree.
 
 
 27
 At the outset, we think it important to make clear that this dispute over the legality of section 93.121(a)(1) relates only to approval of non-federally funded projects. The Agency's rule makes clear that local transportation projects receiving federal funds must satisfy a more stringent conformity requirement than section 93.121(a)(1). Federally funded projects may not proceed unless there exist "a currently conforming transportation plan and currently conforming TIP at the time of project approval." 40 C.F.R. § 93.114 (emphasis added). In other words, during a plan or program conformity lapse, an MPO may not find a federally funded project to be in conformity, and therefore that project may not go forward. The question here is whether non-federally funded projects--defined as "projects which are funded or approved by a recipient of federal funds ... but which do not rely at all on any [federal] funding or approvals," 62 Fed.Reg. at 43,788--may attain conformity status in the absence of a currently conforming plan and program.
 
 
 28
 We begin with the text of the Clean Air Act. Under section 7506(c)(2)(C), an MPO may find a local transportation project to conform with an applicable SIP only if the project meets one of two requirements: Either it must "come[ ] from a conforming plan and program," id. § 7506(c)(2)(C)(i), or its "projected emissions..., when considered together with emissions projected for the conforming transportation plans and programs within the nonattainment area, [must] not cause such plans and programs to exceed the emission reduction projections and schedules assigned to such plans and programs in the applicable [SIP]," id. § 7506(c)(2)(D). Claiming that the requirement that a project "come from a conforming plan and program" is ambiguous, EPA insists that it has reasonably construed this requirement to permit project approval during a conformity lapse, as long as the project comes from the first three years of a once-conforming plan and program. This approach, EPA argues, strikes the proper balance between protecting air quality and avoiding disruption to the transportation planning process. According to petitioner, the statutory text leaves no ambiguity: A project that "comes from a conforming plan and program" means a project that comes from a currently conforming plan and program. Therefore, EDF argues, the statute prohibits approval of any projects, federally funded or not, during a conformity lapse.
 
 
 29
 Giving these words their ordinary meaning, we interpret the phrase "comes from a conforming plan and program"--a phrase entirely in the present tense--to refer to projects that come from a currently conforming plan and program. But even were it possible to read the phrase, as EPA and our dissenting colleague do, to refer to projects that come from a previously conforming plan and program, we think this interpretation is foreclosed by Congress's use of the terms "conforming plan and program" in section 7506(c)(2)(D), by the general conformity criteria of section 7506(c)(1), and by the legislative history of the conformity requirements.
 
 
 30
 Section 7506(c)(2)(D) states that a project not included in a conforming plan and program may be found to conform only if its projected emissions "when considered together with emissions projected for the conforming transportation plans and programs within the nonattainment area," do not exceed the SIP emissions budget. 42 U.S.C. § 7506(c)(2)(D). This provision enables a project to attain conformity status "only if the regional plans and programs are in conformity at the time the project is reviewed." Clean Air Conference Report, 136 Cong. Rec. at 36,108 col.1. Indeed, in its 1996 notice of proposed rulemaking, which led to the Final Rule challenged here, EPA acknowledged that
 
 
 31
 [t]he option provided in section [7506](c)(2)(D) for new projects that were not previously included in a transportation plan/TIP or supporting regional emissions analysis to demonstrate conformity cannot apply during a transportation plan/TIP conformity lapse, because it requires a demonstration that "conforming transportation plans and TIPs" would still conform when the emissions of the new project are considered. Without a conforming transportation plan and TIP in place, this cannot be demonstrated.
 
 
 32
 61 Fed.Reg. 36,112, 36,120 col.2 (1996). We thus have no doubt that the word "conforming" in section 7506(c)(2)(D) means presently conforming. Since section 7506(c)(2)(D) provides an alternative means of demonstrating project conformity when a project does not "come from a conforming plan and program," it would be quite odd to read the word "conforming" in section 7506(c)(2)(C) to mean something different from what it means in section 7506(c)(2)(D).
 
 
 33
 Moreover, were we to read the word "conforming" the way EPA suggests, there would be no assurance that projects approved under section 7506(c)(2)(C) would help eliminate, reduce, or prevent violations of national ambient air quality standards, as required by section 7506(c)(1). According to that provision, a "conforming" transportation project is one that will contribute to "eliminating or reducing the severity and number of violations of the [NAAQS] and achieving expeditious attainment of such standards," 42 U.S.C. § 7506(c)(1)(A), and that "will not--(i) cause or contribute to any new violation of any standard in any area; (ii) increase the frequency or severity of any existing violation of any standard in any area; or (iii) delay timely attainment of any standard or any required interim emission reductions or other milestones in any area," id. § 7506(c)(1)(B). Though doubting the applicability of section 7506(c)(1) to projects approved under section 7506(c)(2), the dissent nevertheless concedes that section 7506(c)(2)(A) expressly incorporates the requirements of section 7506(c)(1)(B) and makes them applicable to projects approved under section 7506(c)(2). See Dissenting Opinion ("Dissenting Op.") at 654-655. Absent a currently conforming plan and program, there is no certainty that a regionally significant transportation project will satisfy any of the section 7506(c)(1)(B) conformity criteria. EPA's interpretation of section 7506(c)(2)(C) thus eviscerates the requirements of section 7506(c)(1)(B) and therefore also the requirements of section 7506(c)(2)(A), creating an untenable inconsistency not only between section 7506(c)(1) and section 7506(c)(2), but also within section 7506(c)(2) itself.
 
 
 34
 Our dissenting colleague accuses us of "embrac[ing] an argument" raised by petitioner "in two sentences of its 'Summary of Argument,' but not at all thereafter." Dissenting Op. at 653. With all due respect, we think the dissent unfairly characterizes petitioner's brief. It is true that petitioner first sets forth this argument in the "Summary of Argument":
 
 
 35
 The rule ... undermines Congress' decision to ensure that long-term investment of resources in regional transportation systems contribute to "eliminating or reducing the severity and number of [NAAQS violations]" (required by § 176(c)(1)(A)) by requiring re-assessment of the conformity of the planned regional transportation system every three-years [sic]. 42 U.S.C. § 7506(c)(4)(B)(ii). By allowing projects from a plan that no longer meets regional emission budgets to be approved, the rule allows elements of the non-conforming plan to be implemented which can interfere with progress toward attaining the NAAQS.
 
 
 36
 EDF Br. at 13 (alteration in original). But far from failing to mention this argument later in its brief, petitioner devotes three pages of its "Argument" section to developing the claim. See id. at 23-25. EDF opens this discussion by citing section 7506(c)(4)(B)(ii) for the proposition that "conformity determinations for a plan and/or program expire at least every three years by operation of law." Id. at 23. It then argues that "[t]he three-year limit on transportation plans and TIPs plays an important role by assuring that plans and TIPs continue to reflect the latest emission targets for a region," specifically mentioning emission reduction targets related to statutorily prescribed ozone and carbon monoxide attainment goals. Id. at 24. "Without the obligation to renew conformity findings every 3 years," EDF concludes, "regions could continue implementing transportation systems designed to meet older emission targets no longer adequate to attain the NAAQS." Id. In addition to paraphrasing the claim first stated in the "Summary of Argument," which explicitly invokes section 7506(c)(1), this last sentence plainly manifests petitioner's belief that EPA's rule fails to ensure that transportation plans, programs, and projects will help "achieve expeditious attainment of [NAAQS]" and will not "delay timely attainment of any [NAAQS]," as section 7506(c)(1) requires. 42 U.S.C. § 7506(c)(1)(A), (c)(1)(B)(iii). We think that petitioner has adequately challenged EPA's regulation under section 7506(c)(1).
 
 
 37
 The legislative history of the 1990 conformity requirements provides one final reason why we think the phrase "conforming plan and program" refers to currently conforming plans and programs. Congress imposed new conformity requirements in order to integrate transportation planning at the local level with attainment and maintenance of air quality standards at the state level. See Clean Air Conference Report, 136 Cong. Rec. at 13,106 col.1 (noting that the statute "will require transportation planning agencies to view their task as the development of a transportation system that meets ... both mobility needs and air quality objectives"). By requiring plans and programs to conform to applicable SIPs at the time of project approval, Congress sought to ensure that "transportation plans and programs [would] serve as part of the pollution control strategy for the metropolitan area." Id. To be sure, plans and programs could also serve this pollution control function, as EPA explains, by "account[ing] for and offset[ting] if necessary the emissions of any non-federal projects that are implemented during a conformity lapse." 62 Fed.Reg. at 43,790 col.1. But that approach would invite local decision-makers to approve transportation projects while deferring development of pollution control strategies during conformity lapses, thereby subverting Congress's intent that the two processes--transportation planning and pollution control--occur simultaneously. See 136 Cong. Rec. at 36,107 col.2 (regional planning process should identify "the comprehensive transportation system for a metropolitan area" in the context of a "comprehensive consideration of alternatives ... and careful analysis of options that can contribute toward achieving the air quality objectives of the Clean Air Act").
 
 
 38
 The Conference Report also describes section 7506(c)(2)(D) as an "exception"--indeed, it is the only exception--to the general rule of section 7506(c)(2)(C). Id. at 36,108 col.1. Under section 7506(c)(2)(D), an excluded project may go forward only if its expected emissions, together with the expected emissions from currently conforming plans and programs, do not exceed the emissions ceilings in the applicable SIP. As we indicated earlier, both Congress and EPA interpret the word "conforming" in this provision to mean currently conforming. See supra at 646. Section 7506(c)(2)(D) thus shows that Congress wanted no transportation projects to proceed without assurance that they would not undermine attainment or maintenance of current air quality standards. Directly contravening this mandate, the Agency's rule allows local officials to approve transportation projects included in plans and programs that previously conformed but presently do not. See 40 C.F.R. § 93.121(a)(1). Because the conformity status of such projects bears no relation to current air quality attainment or maintenance goals, their approval carries no guarantee that their emissions will neither violate current standards nor contribute to existing violations. Indeed, in the preamble to the 1997 Final Rule, EPA admits--without qualification and contrary to its position in this case--that "projects cannot be approved if the plan and TIP have lapsed." 62 Fed.Reg. at 43,797 cols.1-2.
 
 
 39
 EPA offers two additional justifications for its interpretation of section 7506(c)(2)(C). Neither survives scrutiny. First, the Agency points out that under a regulation effective since 1995, a certain category of transportation projects called transportation control measures ("TCMs") may proceed even in the absence of a currently conforming plan and program. See 40 C.F.R. § 93.114(b). According to the Agency, this exemption shows that section 7506(c)(2)(C) of the statute requires no currently conforming plan and program at the time of project approval. But we see no reason to extend the exemption for TCMs to ordinary transportation projects, since the former reduce pollution, see id. § 93.101, while the latter add to it. TCMs are "specifically identified and committed to in the applicable implementation plan," id., and exempted from the requirements of section 7506(c)(2)(C) because, as the Agency explained in the preamble to the 1995 rule, "[b]y definition, a TCM in an approved SIP conforms to the SIP because it is contained in the SIP." 60 Fed.Reg. at 57,180 col.2. This rationale has no applicability to non-TCM projects because such projects never appear in SIPs. See id. at 57,180 col.3.
 
 
 40
 Second, the Agency argues that although the statute requires plan and program conformity determinations at least once every three years, see 42 U.S.C. 7506(c)(4)(B)(ii), the statute contains no such requirement for project conformity determinations. Inferring from this that Congress intended project conformity to be determined not more than once, EPA maintains that a project included in a previously conforming plan and program retains its conformity status, even if conformity of that plan and program eventually lapses. We disagree. Although the statute suggests that Congress did not intend project conformity determinations to occur every three years, it does not follow that Congress intended project conformity determinations to occur only once. Based on our analysis above, we read the statute to require non-federally funded projects to follow the three-year conformity determination schedule applicable to transportation plans and programs up to the point of MPO approval. After MPO approval, non-federally funded projects need undergo no further conformity determinations.
 
 
 41
 In sum, the language and history of the statute's conformity requirements show that Congress intended transportation planning and air quality management to proceed in lock step. By allowing local approval of transportation projects in the absence of currently conforming plans and programs, the Agency's regulation undermines section 7506(c)(2)(C)'s criteria for demonstrating conformity of regionally significant transportation projects to state-level air quality standards. Finding clear congressional intent and thus no need to proceed to Chevron's second step, we hold that section 93.121(a)(1) of the regulations violates the Clean Air Act.
 
 III
 
 42
 Next, petitioner challenges section 93.102(c)(1) of the regulations, which provides that
 
 
 43
 [p]rojects subject to this subpart for which the NEPA process and a conformity determination have been completed by DOT may proceed toward implementation without further conformity determinations unless more than three years have elapsed since the most recent major step (NEPA process completion; start of final design; acquisition of a significant portion of the right-of-way; or approval of the plans, specifications and estimates) occurred.
 
 
 44
 40 C.F.R. § 93.102(c)(1). Known as the "grandfather" rule, this section reflects the Agency's view that "there should only be one point in the transportation planning process at which a project-level conformity determination is necessary." 62 Fed.Reg. at 43,783 col.2. According to petitioner, this regulation, like the one discussed above, violates section 7506(c)(2)(C) of the statute because it allows transportation projects to receive federal funding in the absence of a currently conforming plan and program. Again, we agree.
 
 
 45
 To understand how the "grandfather" rule works, consider the following hypothetical: In 1993, an MPO approves and adopts a regional highway project--for example, an urban beltway. At the time, the beltway is included in both a conforming plan and a conforming program. Three years later, in 1996, the conformity status of the plan and program lapses. In 1997, the MPO acquires a significant portion of the right-of-way for the beltway. Today, ready to start building, the MPO seeks funding from the Department of Transportation. EPA's "grandfather" rule would allow DOT to fund the beltway, since a "major step"--acquisition of right-of-way--occurred within the past three years. But section 7506(c)(2)(C)'s conformity requirement expressly prohibits DOT from "approv[ing], accept[ing], or fund[ing]" the beltway unless it "comes from a conforming plan and program." This means that no transportation project may receive federal funds in the absence of a currently conforming plan and program. See supra Part II. Therefore, to the extent that section 93.102(a)(1) of the regulations allows projects to receive federal funds during plan and program conformity lapses, it violates the Clean Air Act.
 
 
 46
 Defending its "grandfather" rule, EPA cites Environmental Defense Fund, Inc. v. EPA, supra. But that case sustained the "grandfather" rule only as a transition measure "to avoid immediate 'retroactive' implementation of the new [1990] conformity requirement which would impose a substantial and unforeseen burden on federal projects that had already satisfied existing federal requirements [i.e., NEPA review]." 82 F.3d at 456. Nothing in that decision supports what the Agency has done here--forever exempting a project from further conformity determinations where the project's most recent conformity determination occurred more than three years ago and where a "major step" occurred within the past three years.
 
 
 47
 While invalidating section 93.102(a)(1) with respect to federally funded projects, we note that the statute does not preclude the "grandfather" clause from applying to nonfederally funded projects. Although section 7506(c)(2)(C) of the statute prohibits MPO or DOT approval of non-federally funded projects during a plan and program conformity lapse, it nowhere prohibits implementation of such projects as long as their approval occurred prior to the conformity lapse.
 
 IV
 
 48
 We turn finally to petitioner's challenge to those sections of the regulations that permit or require plan, program, and project conformity to be based on motor vehicle emissions budgets in SIP revisions that a state has submitted to EPA, but that EPA has not yet approved or has disapproved. See 40 C.F.R. §§ 93.118(e)(1), 93.120(a)(2), 93.124(b). Under these regulations, if EPA disapproves a submitted SIP revision without a "protective finding"--i.e., a determination that the submission "contains adopted control measures or written commitments to adopt enforceable control measures that fully satisfy the [relevant statutory] emissions reductions requirements," id. § 93.101--then "[d]uring the first 120 days following [such] disapproval..., transportation plan, TIP, and project conformity determinations shall be made using the motor vehicle emissions budget(s) in the disapproved control strategy implementation plan." Id. § 93.120(a)(2). Emissions budgets contained in a submitted SIP revision also guide conformity determinations when EPA makes no finding within 45 days of submission regarding the adequacy of the budgets. See id. § 93.118(e)(1); see also id. § 93.124(b) (allowing conformity to be based on submitted but not-yet-approved SIP revisions). Submitted budgets, however, do not supersede emissions budgets in an approved SIP for the years covered by the SIP. See id. § 93.118(e)(1).
 
 
 49
 Conceding that the Clean Air Act generally requires conformity to be evaluated against approved SIPs, the Agency argues that these regulations represent reasonable responses to statutory silence as to how conformity should be determined when no approved SIP exists or when the approved SIP contains no adequate motor vehicle emissions budget. We disagree. Although the statute nowhere explicitly dictates how conformity should be determined under the circumstances EPA describes, any attempt by the Agency to fill these gaps must satisfy section 7506(c)(1)(B)'s generally applicable conformity requirements. Where EPA disapproves a SIP revision without a protective finding, i.e., without determining that it contains adequate measures to reduce emissions to statutorily required levels, see 40 C.F.R. § 93.120(a)(2), or where EPA fails to determine the adequacy of motor vehicle emissions budgets in a SIP revision within 45 days of submission, see id. § 93.118(e)(1), there is no reason to believe that transportation plans and programs conforming to the submitted budgets "will not--(i) cause or contribute to any new violation of any standard in any area; (ii) increase the frequency or severity of any existing violation of any standard in any area; or (iii) delay timely attainment of any standard...." 42 U.S.C. § 7506(c)(1)(B). Indeed, nothing in the regulations requires MPOs to show that an area's projected emissions would be lower if plans and programs conforming to a submitted budget were implemented than if they were not. See 62 Fed.Reg. at 43,781 col.2 (noting that submitted budgets replaced "build/no-build test" as measure of conformity under Final Rule). Even if it were true that section 93.118(e) gives states an incentive to file emissions budgets conforming to law, see Dissenting Op. at 656, the regulation would still violate the statute by allowing conformity determinations to take effect where federal agencies and MPOs have not discharged their "affirmative responsibility" to provide an "assurance of conformity." 42 U.S.C. § 7506(c)(1). To be sure, section 93.118(e)(6) of the regulations provides that "the MPO and DOT's conformity determinations [based on unapproved or disapproved SIPs] will be deemed to be a statement that the MPO and DOT are not aware of any information that would indicate that emissions consistent with the motor vehicle emissions budget" would violate section 7506(c)(1)(B)'s conformity criteria. But how can an MPO or DOT satisfy its "affirmative responsibility" to provide an "assurance of conformity" through a "deemed" statement indicating mere ignorance of non-conformity? For these reasons, we grant petitioner's request that we remand sections 93.118(e)(1) and 93.120(a)(2) to EPA for further rulemaking to harmonize these regulations with section 7506(c)(1)'s conformity requirements.
 
 
 50
 Section 93.124(b) is also inconsistent with the Clean Air Act, but for a different reason. That provision reads:
 
 
 51
 If an applicable implementation plan submitted before November 24, 1993, demonstrates that emissions from all sources will be less than the total emissions that would be consistent with attainment and quantifies that "safety margin," the State may submit an implementation plan revision which assigns some or all of this safety margin to highway and transit mobile sources for the purposes of conformity. Such [a SIP] revision ... may be used for the purposes of transportation conformity before it is approved by EPA.
 
 
 52
 Id. § 93.124(b). Unlike sections 93.118(e)(1) and 93.120(a)(2), which apply when there is no applicable SIP or no SIP with an applicable emissions budget, section 93.124(b) applies when there is an applicable SIP--i.e., it does not purport to fill a statutory gap. While it may be true that plans and programs conforming to a SIP revision under section 93.124(b) "will not cause, worsen, or prolong violations of air quality standards," Dissenting Op. at 658, the statute nevertheless requires conformity determinations to be based on a SIP "approved or promulgated under section 7410 of this title" where such a SIP exists. 42 U.S.C. § 7506(c)(1); see also id. § 7506(c)(2) (requiring transportation plans, programs, and projects "to conform to any applicable implementation plan in effect under this chapter"). Indeed, EPA itself has said that it "does not believe that it is legal to allow a submitted SIP to supersede an approved SIP for years addressed by the approved SIP." 62 Fed.Reg. at 43,783 col.3; see also 40 C.F.R. § 93.118(e)(1). Because section 93.124(b) would allow a submitted but unapproved SIP revision to supersede an approved SIP, it violates the Clean Air Act.
 
 V
 
 53
 Our dissenting colleague charges that our conclusions today frustrate EPA's goal of allowing greater flexibility in the conformity determination process. See Dissenting Op. at 651-652. Whatever the Agency's policy goals, our job is to interpret the statute. Here, the statute imposes an elaborate array of requirements that, according to the dissent, amount to "a congressional effort to micromanage local transportation planning." Id. at 652. If this legislative scheme is too onerous, it is up to Congress to provide relief, not this court.
 
 
 54
 We grant EDF's petition for review and hold that sections 93.121(a)(1) and 93.102(c)(1) of EPA's regulations are unlawful because they depart from the criteria for demonstrating project conformity established in section 7506(c)(2)(C) of the Clean Air Act. In addition, we remand sections 93.118(e)(1) and 93.120(a)(2) of the regulations for the Agency to align these regulations with the general conformity criteria of section 7506(c)(1)(B). Finally, we hold that section 93.124(b) of the regulations violates section 7506(c)(1)-(2) of the Act by allowing a submitted SIP revision to supersede an approved or applicable SIP.
 
 
 55
 So ordered.
 
 
 56
 STEPHEN F. WILLIAMS, Circuit Judge, dissenting:
 
 
 57
 The 1990 conformity amendments to the Clean Air Act ("CAA") were intended to harmonize the transportation planning process for polluted metropolitan areas with air quality plans (technically, "state implementation plans" or "SIPs") established by state authorities. In particular, the conformity amendments prohibit certain transportation activities from going forward unless relevant entities have determined that the activities are "in conformity"--that is, that they meet certain criteria relating to air quality. The Act's conformity requirements are astonishingly confusing, and could if interpreted as stringently as possible seriously disrupt state and local transportation planning. That would "frustrate the process of state and federal cooperation and the integrated planning that section 176(c)(1) was created to foster." EDF v. EPA, 82 F.3d 451, 468 (D.C.Cir.1996). The EPA attempted in this rule to reduce disruption and make the conformity determination process "more logical and feasible;" 62 Fed.Reg. 43,780, 43,781 (1997), by allowing greater flexibility than it had permitted in its 1993 conformity regulations. See 62 Fed.Reg. at 43,780. In accepting all the petitioners' challenges to the rule, the majority undoes much of what EPA intended to accomplish. Although I believe there are three respects in which the EPA has not adequately explained itself, I cannot find it guilty of the thoroughgoing misunderstanding of the statute that leads the majority to find for EDF on every issue. Accordingly, I dissent.
 
 
 58
 Of course when a congressional effort to micromanage local transportation planning in as much detail as this statute is followed by a judicial decision that the agency must put states and localities in an even tighter straightjacket, one may feel that Congress asked for it. But one cannot say the same for the hapless citizens who must live with the results.
 
 
 59
 I. Local approval of nonfederal projects not from currently conforming plan and program
 
 
 60
 The first regulation the majority strikes down is 40 C.F.R. § 93.121(a)(1). It allows certain nonfederal entities to adopt or approve projects contained in the first three years of a transportation plan and program (i.e., designated for implementation within those years) that was once in conformity, even if conformity has since lapsed. I disagree with the majority here because I think the regulation reflects a reasonable interpretation of 42 U.S.C. § 7506(c)(2)(C). That provision prohibits metropolitan planning organizations (known as "MPOs") and other recipients of federal funds from approving certain transportation projects, including those covered by the challenged regulation, unless the projects "come[ ] from a conforming plan and program." The majority holds that this phrase requires the projects in question to come from a plan and program that conforms at the time of approval.
 
 
 61
 EPA argues that the phrase allows approval of any project that comes from a plan and program that conformed at one time, even if the approval is given after conformity has lapsed. The statutory text permits EPA's view, and the agency's interpretation is reasonable in light of its goal of protecting localities from disruption caused by conformity lapses, which appear frequently to be beyond local control. The Department of Transportation must redetermine the conformity of plans and programs every three years, and must also make a new conformity determination within 18 months of EPA approval of a SIP revision that establishes or changes emissions budgets, among other circumstances. If the DOT fails to make the required determinations within the prescribed time frames, conformity will lapse. See 40 C.F.R. §§ 93.104(b)(3), 93.104(e).
 
 
 62
 The majority argues that since the phrase "comes from a conforming plan and program" is in the present tense, its "ordinary meaning" is "comes from a currently conforming plan and program." Maj. Op. at 646. But that is too simple; the phrase is ambiguous. "Comes from X" can mean "has its origin in X," and when the phrase is used that way, the time for determining X's qualities can be the time of origination. A Belfaster who 10 years from now says he "comes from a bleeding land" will be understood--no matter how effective the recent peace accord. A layabout who says he "comes from a hard-working family" can be telling the truth even if all his relatives are dead.[1]
 
 
 63
 The majority advances three arguments against EPA's interpretation here--one based on the use of the word "conforming" elsewhere in the statute, another on the requirements of another statutory provision dealing with conformity, and the third on the legislative history. None is persuasive.
 
 
 64
 First, the majority appeals to the use of the word "conforming" as an adjective in § 7506(c)(2)(D). This argument starts with the decision that the "conforming" is used in that provision to mean "currently conforming." Next, the majority argues that since (c)(2)(D) and (c)(2)(C) provide alternate ways of determining project conformity, the term should be read to mean the same thing in each paragraph. Together, these propositions lead the majority to the conclusion that (c)(2)(C) also requires a "currently conforming" plan.
 
 
 65
 The determination that (c)(2)(D) requires a "currently conforming" plan is surely contestable.[2] But even if it is correct, it was reasonable for EPA to decide that this stricture did not carry over to (c)(2)(C). First, the provisions differ in language: the former provision lacks the phrase "comes from," and has no other linguistic hook suggesting that one should look back to an earlier time of origin. Second, I find nothing "odd," Maj. Op. at 646-47, from a substantive point of view about the difference EPA's interpretation creates between the two ways of determining project conformity. Section 7506(c)(2)(C) governs projects that were included in plans and programs that have gone through a conformity determination, while (c)(2)(D) governs projects that were never before considered in such a determination. In light of the intent of the Clean Air Act amendments to foster state-federal partnership, it is not unreasonable for EPA to protect states' reliance interest where a project has already been considered in a conformity determination; no such reliance interest exists for projects that fall under (c)(2)(D).
 
 
 66
 The majority next finds EPA's regulation flawed because it allows approval of projects that violate § 7506(c)(1), which defines conformity in general terms and applies to all federal activities, not just transportation-related ones. In its essence § 7506(c)(1) forbids federal activities that will cause, worsen, or prolong violations of air quality standards. It also forbids MPO approval of projects with such effects.
 
 
 67
 The majority holds that because EPA's rule allows MPO approval of transportation projects from transportation plans that are not in conformity at the time of approval, it allows MPOs to approve projects that do not meet § 7506(c)(1)'s requirements and thus violates that section.
 
 
 68
 In doing so, the majority embraces an argument that EDF's opening brief raised only in a novel and somewhat deceptive way. It mentioned the claim in two sentences of its "Summary of Argument," but not at all thereafter. See EDF Br. at 13. In its main argument, instead, EDF claimed that § 93.121 violated § 7506(c)(2). Its only argument from § 7506(c)(1) was a general one--that EPA should issue further regulations implementing that provision; and on that subject it didn't mention § 93.121, although it gave examples of other regulations that in its view showed that the new conformity rule allowed violations of § 7506(c)(1). Unsurprisingly, EPA did not respond to the (c)(1) argument.
 
 
 69
 The majority argues that EDF did come through with an elaboration of its (c)(1) claim at pages 23-25 of its brief. But the referenced argument is quite distinct. It is based on a perceived tension between EPA's interpretation of (c)(2)(C) and another statutory provision, § 7506(c)(4). There is no explicit mention of (c)(1) in the passage, nor is there an implicit claim that EPA's interpretation violates (c)(1). Instead, the discussion elaborates on the supposed problems for EPA's interpretation created by § 7506(c)(4), which calls for periodic redetermination of the conformity of transportation plans and programs. EDF's heading says that the EPA's regulation "Eviscerates Congress' Decision to Set Time Limits on Plan, TIP and Project Conformity," EDF Br. at 23, and the text goes on immediately to cite § 7506(c)(4), which indeed sets such time limits. Raising one argument is not an implicit raising of the other.
 
 
 70
 The closest EDF comes to making the (c)(1) argument is its claim that EPA's interpretation allows regions to "continue implementing transportation systems designed to meet older emissions targets no longer adequate to attain the NAAQS." EDF Br. at 24. This sentence appears in the midst of the (c)(4) argument and is best read as an illustration of the alleged tension between that provision and EPA's regulation, not as raising a claim based on (c)(1). Though the sentence does contain the word "attainment," which also appears in (c)(1), there is no other textual reference to the statutory provision, and no implicit reference is obvious. A project does not violate the relevant provisions of (c)(1) unless it actually causes, worsens, or prolongs a violation of the NAAQS, or is not in "conformity to [the relevant SIP's] purpose of ... achieving expeditious attainment" of the NAAQS. It is by no means clear that progress toward targets that are "no longer adequate" fits into any of those categories. The vaguely drafted last category (requiring "conformity to [a plan's] purpose of ... achieving expeditious attainment") is the most likely candidate, but EDF never even hints at an explanation of how a purpose is thwarted by inadequate contribution to its realization. That judges are able to find a dim connection between EDF's argument and (c)(1)--after the fact--is hardly a showing that EDF raised a (c)(1) argument.
 
 
 71
 In the interests of fairness to parties and avoidance of improvident decisions, we normally refuse to consider arguments that are raised only in the reply brief. See, e.g., Doolin Sec. Sav. Bank v. OTS, 156 F.3d 190, 191 (D.C.Cir.1998). This rule also extends to arguments raised in only a conclusory fashion in the opening brief and not addressed by appellee. See Texas Rural Legal Aid, Inc. v. Legal Servs. Corp., 940 F.2d 685, 697-98 (D.C.Cir.1991). The rule is especially compelling when the statutory and regulatory scheme presents as many opportunities for error as this one.
 
 
 72
 In any event, even if the argument had been properly raised it should have been rejected. To understand why, we have to look at the overall structure of § 7506(c). Section 7506(c)(1) is a general requirement covering federal activities. It forbids federal entities to engage in activities that do not conform to an applicable SIP and, in subparagraphs (A) and (B), gives a definition of conformity. Sections 7506(c)(2) and (3) both address transportation and provide rules for conformity determinations in that context. Section 7506(c)(3) establishes interim rules, and § 7506(c)(2) is the main transportation conformity provision.
 
 
 73
 The majority's opinion assumes that situations governed by (c)(2) are also governed by (c)(1). But the statute can reasonably be read to say that (c)(2) and (c)(3) govern exclusively in their own domains. On this reading, § 93.121(a)(1), which governs a situation covered by (c)(2)(C), would not be subject to invalidation under (c)(1).
 
 
 74
 The most obvious support for this reading comes from the fact that the specific transportation conformity requirements are not entirely consistent with the general conformity requirements, so that applying (c)(1) to all situations governed by (c)(2) and (c)(3) produces contradiction. Section 7506(c)(3), for instance, provides that "conformity" of a plan "will be demonstrated" if the plan contributes to annual emissions reductions of ozone and carbon monoxide and meets certain other requirements not relevant here. See § 7506(c)(3)(A)(iii). Thus, a plan allowing activities that cause a violation of (for example) particulate matter standards is in conformity under (c)(3) as long as the other requirements are met. Not so under the general rules of (c)(1), since that provision forbids activities that cause violations of "any standard." See § 7506(c)(1)(B)(i). The transportation-specific (c)(3) rule triumphs in this conflict. Each statutory provision is normally presumed to serve a function; thus a specific provision governing a set of circumstances entirely within a more general one must, within its own scope, prevail over the more general. Otherwise it would be deprived of its function. Cf. Hemenway v. Peabody Coal Co., 159 F.3d 255, 264 (7th Cir.1998) (noting that where the scope of one provision is not completely contained within the scope of the other it is impossible to call either "more specific"). That is the case here. Subsection (c)(1) nominally covers all federal activities, and (c)(3) covers only transportation activities, and those only for a limited time.
 
 
 75
 Section 7506(c)(2)(A) also supports the view that the specific requirements replace the general ones. It requires a finding that a transportation plan or program "will conform to the requirements of [ § 7506(c)(1)(B)]" before the plan or program can be found in conformity. The majority dubs my observation to this effect a "concession." Maj. Op. at 647. But since the issue here is what (c)(2)(C) requires, (c)(2)(A)'s specific imposition of the requirement makes clear that the draftsmen, contrary to the majority, understood that the generality of (c)(2) situations did not require compliance with (c)(1).
 
 
 76
 Thus, it appears that it would be reasonable for EPA to find that (c)(1)'s requirements do not apply to situations governed by (c)(2) and (c)(3) except where specifically incorporated. There is no such specific incorporating language in (c)(2)(C), the transportation project conformity provision that governs here. I cannot find any assertion of this analysis in the record of the rulemaking, but as EDF did not properly raise the issue, EPA has had no real opportunity to explain its view of how (c)'s subsections relate to each other.
 
 
 77
 Finally, the majority points to statements in the legislative history. In general these say that one purpose of the CAA amendments was to promote integration of the air quality and transportation planning processes, a proposition with which neither EPA nor anyone else has any quarrel. And the majority ends as it began, with an appeal to (c)(2)(D)'s purported requirement of a "currently conforming" plan. As I explained above, this stricture, if it exists, does not bind EPA in interpreting (c)(2)(C).
 
 
 78
 Thus, Congress has not "directly addressed the precise question at issue" in this case, Chevron U.S.A. Inc. v. NRDC, 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), so we must uphold the EPA's resolution of the statutory ambiguities if it is reasonable. And it is, given the Act's overall purpose to promote a cooperative regime of integrated planning.
 
 
 79
 Although the EPA's treatment of non-federally funded projects seems to me reasonable as a matter of statutory interpretation, I have found nothing in the record adequately explaining its different treatment of federally and non-federally funded projects. Under § 93.121(a)(1), a project that is not federally funded may be approved by an MPO as long as it comes from the first three years of a transportation plan that once was in conformity. But a federally funded project may not be approved unless there is a "currently conforming transportation plan and currently conforming TIP at the time of project approval." See 40 C.F.R. § 93.114. Nothing in the statute appears to justify such a distinction, and EPA's only explanation for the disparate treatment appears to be that "the existence of a conforming plan and TIP is not necessary to facilitate the implementation of [nonfederal] projects." 62 Fed.Reg. 43,780, 43,790 (1997). It is undisputed that nonfederal projects can be funded without a currently conforming plan and TIP in place, while federal projects cannot. 42 U.S.C. § 7506(c)(2) provides that "[n]o Federal agency may ... fund any ... project unless such ... project has been found to conform to any applicable implementation plan.... ", while no such restriction covers nonfederal projects. But EPA has not explained why that difference is relevant to the project approval, as to which the statutory requirements draw no evident distinction between federal and nonfederal contexts. Because the EPA may be able to explain the difference, and if not might adopt for federal projects the rule it has chosen for non-federal ones, and in order to avoid the disruption that would be caused by an interim change that might itself be changed, I would simply remand for further explanation. See A.L. Pharma, Inc. v. Shalala, 62 F.3d 1484, 1492 (D.C.Cir.1995).
 
 
 80
 II. Grandfathering of federally funded projects unless three years elapse between major steps
 
 
 81
 40 CFR § 93.102(c)(1) provides that transportation projects that have been once determined to be in conformity may proceed toward completion without further conformity determinations unless more than three years elapse between "major steps" of the project. The majority invalidates this so called "grandfathering" provision on the basis of the same construction of the statute that leads it to invalidate § 93.121(a)(1)--its reading of the words "comes from a conforming plan and program" in § 7506(c)(2)(C)(i). For the reasons given in the preceding section, I disagree.
 
 
 82
 III. Use of emissions budgets from unapproved/disapproved SIP revisions and reallocation of safety margins
 
 
 83
 The majority next addresses three regulations that allow conformity to be determined on the basis of emissions budgets contained in SIP revisions that EPA has not approved, remanding two and vacating one. The first of these, 40 C.F.R. § 93.118(e)(1), allows an MPO or DOT to show consistency with emissions budgets in unapproved SIP revisions in conformity determinations starting 45 days after submission of the revision. In short, anticipating that sometimes it will be unable to pass on proposed SIP revisions promptly, the agency provides for use of a second-best substitute after 45 days.
 
 
 84
 The majority's sole basis for remanding this provision is the proposition that the regulation is insufficient to ensure compliance with 42 U.S.C. § 7506(c)(1)(B), the government-wide conformity requirements. The theory is faulty. Even if we assume that (c)(1) applies generally to transportation projects covered by §§ 7506(c)(2) and (3) (contrary to my analysis in part I), § 93.118(e)(1) does not allow violations of (c)(1).[3]
 
 
 85
 Section 7506(c)(1) makes it the "affirmative responsibility" of an agency engaging in or supporting a federal activity to assure that the activity does not cause, exacerbate, or prolong any violation of air quality standards. For various reasons § 93.118(e)(1) is adequate to ensure that the DOT (and MPOs) carry out this mandate when emissions budgets have been submitted but not yet approved. First, because EPA will approve SIP revisions only if the revised SIP, including the budgets, includes enforceable control measures to reach and maintain air quality standards by specified dates, see 42 U.S.C. §§ 7410(a)(1), (a)(2)(A), (k)(3), states have an incentive not to submit the "inflated emissions budget[s]" about which EDF is concerned. EDF Br. at 33. Furthermore, EPA's regulations require a public hearing and consultation between state, federal, and local agencies before the SIP revision can be submitted. See 62 Fed.Reg. 43,780, 43,781 (1997).
 
 
 86
 Just as the substantive rules and procedural controls on SIP revisions create some probability that states will file emissions budgets conforming to law, § 93.118(e)(6) makes the MPOs and DOT a further screen. It provides that when conformity determinations are made under § 93.118(e)(1), "the MPO and DOT's conformity determinations will be deemed to be a statement that the MPO and DOT are not aware of any information that would indicate that emissions consistent with the motor vehicle emissions budget" would violate (c)(1). If an MPO or DOT official is legally deemed to be making such a statement, presumably he or she will be reasonably careful that its factual underpinnings are valid--on pain, surely, of at least a bureaucratic black eye if later experience should falsify the implicit representations.
 
 
 87
 Taken together, §§ 93.118(e)(1) and (e)(6) establish a high probability that submitted emissions budgets meet the requirements of (c)(1). And a decent probability is all that any system can assure: even the EPA might err in giving an approval. In light of the purpose of the Clean Air Act to "foster" a "process of state and federal cooperation," EDF v. EPA, 82 F.3d 451, 468 (D.C.Cir.1996), and the procedures nurturing sound state decisionmaking, it is hardly unreasonable for EPA to allow the implied representation of an MPO or DOT as to fulfill its "affirmative responsibility" to assure conformity.
 
 
 88
 The majority emphasizes the fact that the MPO or DOT bears an "affirmative responsibility" to assure conformity. But "affirmative" can be used essentially as an intensifier that emphasizes the existence of a responsibility, rather than as a prescription of some means for its accomplishment. See, e.g., Dayton Bd. of Educ. v. Brinkman, 443 U.S. 526, 538-39, 99 S.Ct. 2971, 61 L.Ed.2d 720 (1979); CBS v. DNC, 412 U.S. 94, 110-11, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973).
 
 
 89
 EDF's principal argument against § 93.118(e)(1)--not addressed by the majority--is that that the regulation illegally allows conformity determinations to be made on the basis of something other than the "applicable implementation plan," as required by § 7506(c)(2) or (c)(3), or an implementation plan that has been "approved," as required by § 7506(c)(1), because it allows a submitted SIP revision to be treated as approved before approval. This somewhat overstates the case. The regulation provides only that the emissions budgets are to be used to determine conformity; neither the regulation nor EPA's comments state that the revision may be treated as approved. The potential problem with the regulation is that it does not provide a reasonable way of determining conformity with the "applicable," that is, existing, SIP--not that it illegally allows revisions to be treated as approved before they actually are. And the regulation does provide a reasonable basis for determining conformity with the applicable SIP, at least in some cases.
 
 
 90
 Section 93.118(e)(1) applies only when the most recent approved SIP contains no motor vehicle emissions budgets. In the absence of emissions budgets, the only possible relevant statutory provisions for finding conformity with the "applicable implementation plan" are §§ 7506(c)(3), which governs an interim period that began with the passage of the CAA amendment, and (c)(1), which as I argued at 656 n.3 above, may govern any gap between the end of the (c)(3) interim period and the approval of SIPs with emissions budgets. My conclusion above that §§ 93.118(e)(1) and (e)(6) together provide a reasonable means of determining conformity addresses any application of (c)(1).
 
 
 91
 That leaves the possible application of (c)(3). EPA has included no requirement that the entity making the conformity finding consider the activity's consistency with (c)(3). So there may be a deficiency here. But it is not clear whether § 93.118(e)(1) and § 7506(c)(3) are ever in effect at the same time; some statements of EPA in the rulemaking suggest that the interim period (c)(3) covers is over before the emissions budget submission that triggers § 93.118(e)(1) takes place. See 58 Fed.Reg. 62,188, 62,191/1 (1993) (stating that although the interim period lasts only until the "conformity SIP revisions are approved, EPA is extending the interim requirements until the control strategy SIPs [i.e., the SIPs with emissions budgets] are submitted"). Since no party has briefed the issue and the present record is insufficient to answer the question, I would remand the issue for further explanation.
 
 
 92
 The next regulation that the majority remands, 40 C.F.R. § 93.120(a)(2), allows use of emissions budgets in SIP revisions that EPA has disapproved for 120 days after the disapproval. The majority rejects it on the same ground as § 93.118(e)(1)--failure to ensure compliance with (c)(1). I agree with the majority that if (c)(1) is applicable, § 93.120(a)(2) cannot be said to satisfy it. Unlike § 93.118(e)(1), this section cannot be defended as governing cases where there are reasonable guarantees that the permitted transportation activities will not violate § 7506(c)(1); the budgets at issue have actually been rejected as inadequate. If (c)(3) is applicable to situations covered by § 93.120(a)(2), that section is likely violated as well; (c)(3)(A)(iii) requires plans and programs to "contribute to annual reductions" in ozone and carbon monoxide nonattainment areas, and there is no reason to believe that emissions budgets specifically disapproved without a protective finding meet that criterion. It is possible, however, that none of (c)(1), (2), or (3) apply. Perhaps (c)(2) and (3) entirely preempt (c)(1) with respect to transportation and § 93.120(a)(2) applies only during a gap that may, as I explained above, exist between those two provisions. Although EPA argues that § 93.120(a)(2) exists in a statutory gap, its brief and rulemaking statements fail to explain just why such a gap exists. Thus, I would require further explanation of the statutory basis for this regulation as well.
 
 
 93
 The last of the challenged regulations, 40 C.F.R. § 93.124(b), applies to states with SIPs that indicate that emissions from all sources are less than the total emissions that would be consistent with attainment of air quality standards and that quantify that "safety margin." The regulation allows such states to submit a SIP revision that assigns some of the safety margin to transportation sources and to use the revision for conformity purposes before it is approved by EPA. The majority invalidates this provision for the same reason EDF argues the last two provisions should be invalidated--the regulation violates the requirement that conformity determinations be "based on a SIP 'approved or promulgated under section 7410 of this title.' " Maj. Op. at 651. Here, it seems clear that activities found in conformity on the basis of the "safety margin" will not cause, worsen, or prolong violations of air quality standards, and thus that they conform to the applicable implementation plan under § 7506(c)(1). EDF has given no reason to doubt this conclusion, or to believe that activities producing emissions within the "safety margin" violate § 7506(c)(3). Thus, as above, the regulation can reasonably be read to authorize the "use" of the revision as a reasonable alternate means of finding conformity with the existing SIP, rather than an illegitimate means of prematurely amending one.
 
 
 94
 I dissent.
 
 
 
 [1]
 It might be said that transportation projects do not "originate" in transportation plans or programs; projects in a plan may be more like stories in an anthology than chapters in a novel. But the hypothesis is not strong enough to give the phrase "comes from a conforming plan" the clear meaning that the majority finds. The statute establishing the federal transportation planning process prescribes the designation of MPOs to carry out a "continuing, cooperative, and comprehensive" planning process, 23 U.S.C. § 134(a), by developing plans and programs that contain the projects to be implemented, id. § 134(h)(2)(A). This language, if anything, suggests the novel metaphor more than the anthology; in any event, it cannot be said to establish the anthology metaphor with the clarity necessary for the majority's interpretation
 
 
 [2]
 The majority cites two pieces of evidence for its idea that the plan must be currently conforming, the Clean Air Conference Report and a statement by EPA. Assertions contained in the former document, despite what the majority says, are not interpretations by "Congress," Maj. Op. at 647-48, but by committee drafts persons. With respect to the EPA's statement, even if the majority were correct that the agency has contradicted itself in its interpretations of (c)(2)(D) and (c)(2)(C), the existence of that contradiction tells us at most that one of the interpretations must be wrong--not that the EPA's reading of (c)(2)(D) must be right
 
 
 [3]
 The EPA argues that § 93.118(e)(1) covers a gap between (c)(2) and (c)(3). If so, then even if (c)(2) and (c)(3) preempt (c)(1) where they apply, (c)(1) might spring to life for areas left blank by them. On the other hand, (c)(2) and (c)(3) might preempt (c)(1)'s independent effect over the entire field of transportation, including any gaps. Because I find that § 93.118(e)(1) is sufficient to guard against violations of (c)(1), I need not reach that argument here