PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

1000 FRIENDS OF MARYLAND,
            *Petitioner,*

            v.

CAROL M. BROWNER, in her official
capacity as Administrator, U.S.
Environmental Protection Agency;
THE UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY,                      ⎬      No. 00-1489
            *Respondents,*

BWI BUSINESS PARTNERSHIP,
INCORPORATED,
            *Intervenor,*

ADVOCATES FOR SAFE AND EFFICIENT
TRANSPORTATION,
            *Amicus Curiae.*

On Petition for Review of an Order
of the Environmental Protection Agency.

Argued: April 2, 2001

Decided: September 11, 2001

Before LUTTIG and TRAXLER, Circuit Judges, and
Lacy H. THORNBURG, United States District Judge for the
Western District of North Carolina, sitting by designation.

---

Petition denied by published opinion. Judge Traxler wrote the opinion, in which Judge Luttig and Judge Thornburg joined.

---

## COUNSEL

**ARGUED:** Jeffrey Herrema, Student Attorney, Wade Wilson, Student Attorney, Environmental Law Clinic, UNIVERSITY OF MARYLAND SCHOOL OF LAW, Baltimore, Maryland, for Petitioner. David Jay Kaplan, Environment & Natural Resources Division, Environmental Defense Section, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondents. **ON BRIEF:** Rena I. Steinzor, Brian Higgins, Student Attorney, Environmental Law Clinic, UNIVERSITY OF MARYLAND SCHOOL OF LAW, Baltimore, Maryland, for Petitioner. John Cruden, Acting Assistant Attorney General, David Gualtieri, Environment & Natural Resources Division, Environmental Defense Section, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Sara Schneeberg, Office of General Counsel, ENVIRONMENTAL PROTECTION AGENCY, Washington, D.C.; Cecil A. Rodrigues, Office of Regional Counsel-Region III, ENVIRONMENTAL PROTECTION AGENCY, Philadelphia, Pennsylvania, for Respondents. Norman W. Fichthorn, Allison D. Wood, Virginia S. Albrecht, HUNTON & WILLIAMS, Washington, D.C.; Michael C. Powell, GORDON, FEINBLATT, ROTHMAN, HOFFBERGER & HOLLANDER, L.L.C., Baltimore, Maryland, for Intervenor. David M. Friedland, Gus B. Bauman, David M. Williamson, BEVERIDGE & DIAMOND, P.C., Washington, D.C., for Amicus Curiae.

---

## OPINION

TRAXLER, Circuit Judge:

1000 Friends of Maryland (the "Petitioner"), a citizens group "committed to the advocacy of wise land use policies that will abate environmental problems throughout Maryland," Brief of Petitioner at 1, seeks judicial review under the Clean Air Act of a final action taken by the Environmental Protection Agency ("EPA") in connection with Baltimore's efforts to comply with the Clean Air Act's ozone requirements. We deny the petition for review.[1]

---

[1]Briefs in support of the EPA's position have been filed by intervenor BWI Business Partnership, Inc. ("BWI"), which "promot[es] economic

I. *Statutory Framework*

The Clean Air Act, 42 U.S.C.A. §§ 7401 et seq. (West 1995 & Supp. 2001) (sometimes the "CAA" or the "Act"), is a comprehensive program for controlling and improving the nation's air quality. Under the CAA, the EPA identifies air pollutants that endanger the public health or welfare, determines what concentrations of those pollutants are safe, and promulgates those determinations as national ambient air quality standards ("NAAQS"). *See* 42 U.S.C.A. §§ 7408, 7409. Each state bears responsibility for ensuring that its ambient air meets the appropriate NAAQS. *See* 42 U.S.C.A. § 7407(a). Ozone is one of the pollutants identified and regulated by the EPA.[2] *See* 40 C.F.R. § 50.9 (2001).[3]

States must establish a state implementation plan ("SIP") that provides "for implementation, maintenance, and enforcement" of the EPA's air quality standards. 42 U.S.C.A. § 7410(a)(1). The Clean Air Act requires SIPs to include "enforceable emission limitations and other control measures, means, or techniques, . . . as well as schedules

---

development and transportation management in the region surrounding the Baltimore/Washington International Airport," Brief of Intervenor, Disclosure Statement, and *amicus curiae* Advocates for Safe and Efficient Transportation ("ASET"), "a coalition of national trade associations representing the transportation building industry, home builders, builders of roadways and public transit, designers and consultants, transportation agency officials, suppliers of building materials, and labor," Brief of *Amicus Curiae* at 1.

[2]Upper atmospheric ozone is beneficial in that it forms a protective layer in the stratosphere that blocks harmful forms of ultraviolet radiation. *See Final Rule on Ozone Transport Commission*, 60 Fed. Reg. 4712, 4712 n.1 (Jan. 24, 1995). Ground level ozone, however, which forms through the reaction of volatile organic compounds and oxides of nitrogen in the presence of heat and sunlight, is very harmful to human health. *See id.*; *Virginia v. United States*, 74 F.3d 517, 519 (4th Cir. 1996).

[3]This case involves Maryland's efforts to attain the "1-hour" ozone standard. *See* 40 C.F.R. § 50.9(a). The EPA's proposed "8-hour" ozone standard, which the Supreme Court recently considered in *Whitman v. American Trucking Ass'ns, Inc.*, 121 S. Ct. 903 (2001), is not at issue here.

and timetables for compliance" to meet the NAAQS. 42 U.S.C.A. § 7410(a)(2)(A). States submit their SIPs to the EPA for approval, and the states must revise their plans "as may be necessary to take account of [NAAQS] revisions," 42 U.S.C.A. § 7410(a)(2)(H)(i), or whenever the EPA determines that a SIP is "substantially inadequate to attain" the NAAQS. 42 U.S.C.A. § 7410(a)(2)(H)(ii).

Areas that do not meet the relevant air quality standards are known as "nonattainment areas." 42 U.S.C.A. § 7407(d)(1)(A)(i). As to attainment of the ozone NAAQS, the CAA establishes five levels of nonattainment classifications—marginal, moderate, serious, severe, and extreme—based upon how close the area comes to meeting the standard. *See* 42 U.S.C.A. § 7511(a)(1). The Act imposes progressively stringent requirements on areas falling within each nonattainment classification. Baltimore is classified as a severe ozone nonattainment area and must attain the ozone NAAQS no later than November 15, 2005.

States with serious, severe, or extreme nonattainment areas must submit to the EPA for approval certain revisions to their SIPs, including "attainment demonstrations" which show how each nonattainment area will achieve the ozone NAAQS by the appropriate date. *See* 42 U.S.C.A. §§ 7511a(c)(2)(A), 7511a(d). Attainment demonstrations "must be based on photochemical grid modeling or any other analytical method determined by the Administrator, in the Administrator's discretion, to be at least as effective." 42 U.S.C.A. § 7511a(c)(2)(A).[4]

To satisfy the statutory requirements, the EPA requires attainment SIPs to

contain an inventory of current NAAQS pollutant emissions,

---

[4]Photochemical grid modeling is a form of computer air quality modeling that evaluates how emissions from various sources combine in the atmosphere and predicts the concentration of pollutants that likely will result. The modeling technique uses "complex computer models that consider monitoring data, meteorology, projected growth in the area, planned emissions reductions, and other factors to predict the ambient level of ozone as of the relevant area's attainment date." Brief of Respondents at 6.

as well as air quality modeling which demonstrates that[,] given certain assumptions about population growth, economic growth, and growth in vehicle miles traveled (VMT), the SIP's control measures will result by a certain date in a level of emissions which is in attainment with the NAAQS.

*Criteria for Determining Conformity*, 58 Fed. Reg. 3768, 3769 (proposed Jan. 11, 1993). This level of emissions yielded after implementation of the SIP control strategies is referred to by the EPA as an "emissions budget." *Id.*

States with serious, severe, or extreme ozone nonattainment areas must also submit SIP revisions that show the area is making "reasonable further progress" towards reaching attainment. *See* 42 U.S.C.A. § 7511a(c)(2)(B). Section 7511a(c)(2)(B) requires that the states "demonstrate in the SIP that emissions of volatile organic compounds (VOC) will be reduced by 15% from 1990 baseline emissions by 1996," and that "in milestone years occurring every three years from 1996 until the attainment date, VOC will be reduced from baseline emissions by an average of three percent per year." 58 Fed. Reg. at 3769. "The [reasonable further progress] requirements in effect create an emissions budget for each milestone year, in addition to the budget that applies for the attainment year." *Id.*

Motor vehicle emissions are major contributors to ozone pollution. *See Virginia v. United States*, 74 F.3d 517, 520 (4th Cir. 1996) ("[A]utomobile exhaust, as a source of both [volatile organic compounds] and nitrogen oxides, is a major cause of increased ozone levels."); Michael R. Yarne, *Conformity as Catalyst: Environmental Defense Fund v. Environmental Protection Agency*, 27 Ecology L.Q. 841, 846 (2000) (noting that light- and heavy-duty vehicles emit a large percentage of the precursors that form to create ozone). Thus, effective control of ozone pollution requires consideration and regulation of vehicle emissions.

The EPA requires that the emissions budgets established in attainment demonstrations and demonstrations of reasonable further progress include a quantitative motor vehicle emissions budget, which establishes the "portion of the total allowable emissions defined in the submitted or approved control strategy implementation plan revision

. . . allocated to highway and transit vehicle use and emissions." 40 C.F.R. § 93.101. According to the EPA, "[a] SIP cannot effectively demonstrate attainment unless it identifies the level of motor vehicle emissions that can be produced while still demonstrating attainment." *Approval and Promulgation of Air Quality Implementation Plans*, 64 Fed. Reg. 70,397, 70,402 (proposed Dec. 16, 1999).

Given the relationship between motor vehicle emissions and ozone pollution, the Clean Air Act also includes certain "conformity" provisions that "integrate[ ] the Clean Air Act with the transportation planning process by conditioning federal approval and funding of transportation activities on their demonstrated compliance with applicable SIPs." *Sierra Club v. EPA*, 129 F.3d 137, 138 (D.C. Cir. 1997).

Pursuant to the conformity provisions, no federal "department, agency, or instrumentality" may "engage in, support in any way or provide financial assistance for, license or permit, or approve, any activity which does not conform to an implementation plan after it has been approved." 42 U.S.C.A. § 7506(c)(1). An activity "conforms" to the applicable SIP only if the activity is consistent with the SIP's "purpose of eliminating or reducing the severity and number of violations of the [NAAQS] and achieving expeditious attainment of such standards," 42 U.S.C.A. § 7506(c)(1)(A), and if the activity will not

> (i) cause or contribute to any new violation of any standard in any area;

> (ii) increase the frequency or severity of any existing violation of any standard in any area; or

> (iii) delay timely attainment of any standard or any required interim emission reductions or other milestones in any area.

42 U.S.C.A. § 7506(c)(1)(B).

The Clean Air Act also requires a state's transportation plans and programs[5] to be consistent with the applicable SIP by providing that

---

[5]Federal law generally requires the designation of a metropolitan planning organization ("MPO") for each urban area with a population of

state officials may not adopt a transportation plan or program, nor find such a plan or program to be in conformity, "until a final determination has been made that emissions expected from implementation of such plans and programs are consistent with estimates of emissions from motor vehicles and necessary emissions reductions contained in the applicable implementation plan." 42 U.S.C.A. § 7506(c)(2)(A). Federal agencies may not "approve, accept or fund any transportation plan, program or project" unless it conforms to the applicable SIP. *Id.* § 7506(c)(2).

As required by section 7506(c)(4), the EPA promulgated regulations establishing criteria and procedures for determining conformity. These regulations provide that the motor vehicle emissions budget ("MVEB") contained in the attainment and reasonable further progress SIPs will be used to make the conformity determination, and the regulations set forth certain criteria against which an MVEB is measured. *See* 40 C.F.R. § 93.118(e)(4). If the EPA determines an MVEB to be adequate under the regulations, the MVEB may be relied upon by agency heads when determining whether a proposed transportation project conforms to the relevant SIP, even though the SIP containing the MVEB has yet to be approved by the EPA. The EPA's use of these adequacy regulations are at the heart of this dispute.

## II. *Procedural History*

In April 1998, Maryland submitted to the EPA its attainment demonstration SIP revision for the Baltimore area (the "Attainment SIP") to show that the area was on track to reduce its emissions and timely attain the ozone NAAQS. The Attainment SIP included the required

---

more than 50,000. *See* 49 U.S.C.A. § 5303(c)(1). The MPO "develops a long range transportation plan . . . which specifies the facilities, services, financing techniques, and management policies that will comprise the area's transportation system over a 20-year period." *Environmental Def. Fund v. EPA*, 167 F.3d 641, 644 (D.C. Cir. 1999); *see* 49 U.S.C.A. § 5303(f). The MPO must also develop a "short-term transportation improvement program . . . which identifies and prioritizes the specific transportation projects to be carried out over the next three years." *Environmental Def. Fund*, 167 F.3d at 644; *see* 49 U.S.C.A. § 5304(b).

photochemical grid modeling, which showed that some peak ozone concentrations would exceed attainment levels. It also included a motor vehicle emissions budget (the "initial MVEB") for the year 2005, the year Baltimore is required to attain the ozone NAAQS.

On October 26, 1999, the EPA determined that the initial MVEB was *not* adequate for conformity purposes. *See* 64 Fed. Reg. at 70,409. The EPA concluded that the budget was not adequate because, among other things, it failed to account for certain emission reductions that would be produced by various previously implemented nationwide regulatory programs. As to the Attainment SIP, the EPA proposed to approve it if, among other things, Maryland committed to adopt additional control measures that the EPA believed were necessary to reach attainment and if Maryland submitted a revised, adequate MVEB. The EPA concluded, however, that Maryland's submitted Attainment SIP contained modeling that satisfied the statutory requirements and that new modeling would not be required with the submission of the required revisions. *See id.* at 70,407.

Shortly after the EPA found the initial MVEB inadequate, Maryland submitted a revised motor vehicle emissions budget for the Baltimore area. The revised budget used updated fleet registration data (information about the types and numbers of vehicles in use) that showed more vehicles in use and higher emissions per vehicle mile traveled. Therefore, even though the budget incorporated (as required by the EPA) the expected emissions reductions produced by the previously implemented nationwide programs, the revised budget was higher than the initial MVEB found inadequate by the EPA.

The EPA posted information about Baltimore's revised MVEB on its website and requested public comment. The only comments received were from the Petitioner. After considering the Petitioner's comments, the EPA determined that the revised MVEB, considered with all other emissions budgets, was consistent with attainment, even though it was higher than the initial budget. The EPA therefore concluded that the revised budget was adequate for conformity purposes.

The Petitioner then filed this action, seeking review of the EPA's determination that the revised MVEB was adequate for conformity purposes. The Petitioner contends that the EPA violated the Clean Air

Act by finding the revised MVEB adequate without requiring additional photochemical grid modeling. The Petitioner also contends that the adequacy determination must be vacated because the EPA failed to sufficiently explain why the revised budget was adequate.

## III. *Analysis*

Before considering the merits of the Petitioner's claims, we must first address the assertions of the EPA, BWI, and ASET that, for various jurisdictional and prudential reasons, this action should be dismissed.

## A.

The Clean Air Act establishes a rather complicated system of judicial review. The Act provides that a petition for review of any "nationally applicable regulations" is to be "filed only in the United States Court of Appeals for the District of Columbia" within 60 days of notice of promulgation, and that a petition for review of "any other final action of the Administrator . . . which is locally or regionally applicable may be filed only in the United States Court of Appeals for the appropriate circuit." 42 U.S.C.A. § 7607(b)(1).

The EPA contends that the Petitioner in reality is challenging the legality of the MVEB adequacy regulations themselves, a challenge that the Clean Air Act requires to have been brought in the Court of Appeals for the D.C. Circuit within 60 days after promulgation of the regulations. Because the adequacy regulations were promulgated several years ago, the EPA claims that this court lacks jurisdiction over the action because it was filed too late and in the wrong court. We disagree.[6]

---

[6]Given our disposition of this issue, it matters not whether section 7607(b) is properly viewed as a jurisdictional provision or merely one establishing venue. *Compare, e.g.*, *Texas Mun. Power Agency v. EPA*, 89 F.3d 858, 866-67 (D.C. Cir. 1996) (concluding that 60-day time limit of section 7607(b) is jurisdictional, but that portion requiring certain actions to be filed with the D.C. Circuit merely establishes venue), *with Monongahela Power Co. v. Reilly*, 980 F.2d 272, 275 (4th Cir. 1993) (treating section 7607(b)'s allocation between the D.C. Circuit and the "appropriate circuit" as jurisdictional).

Contrary to the EPA's argument, the Petitioner is not challenging the legality of the adequacy regulations in a way that would affect whether the petition for review is properly before us. Certainly the Petitioner is unhappy with the EPA's use of the regulations when finding the revised MVEB to be adequate for conformity purposes. But the Petitioner's real argument is *not* that the adequacy regulations are illegal in and of themselves, but that the EPA in this case acted contrary to the dictates of the Clean Air Act when it found the revised budget to be adequate without requiring what the Petitioner perceives to be statutorily mandated additional photochemical grid modeling. That the Petitioner might complain generally about the adequacy regulations when what it seeks is reversal of a final, locally applicable agency action does not make this action one that must be brought in the D.C. Circuit. *See Illinois Envtl. Prot. Agency v. EPA*, 947 F.2d 283, 288-89 (7th Cir. 1991) (concluding that state agency could challenge as a final action the EPA's application of a set-aside regulation to the state agency, notwithstanding the state agency's failure to challenge the regulation in the D.C. Circuit when the regulation was promulgated). We therefore reject the EPA's argument that we lack jurisdiction over this petition for review.

### B.

Intervenor BWI suggests that this petition for review is premature because there has been no final agency action. We disagree.

The Clean Air Act authorizes judicial review of final actions of the Administrator. *See* 42 U.S.C.A. § 7607(b)(1). This grant of jurisdiction incorporates the finality requirements of the Administrative Procedures Act. *See Whitman v. American Trucking Ass'ns, Inc.*, 121 S. Ct. 903, 915 (2001).

When determining whether an agency action is final for purposes of judicial review, the focus is not on the label attached to the action but on the nature of the action. To be final, "the action under review [must] mark the consummation of the agency's decisionmaking process." *Id.* (internal quotation marks omitted). That standard is clearly satisfied here. The EPA has reviewed the revised MVEB and found it to be adequate for purposes of making conformity determinations, thus opening the door to the approval, funding, and construction of

transportation projects that conform to the budget. Although the EPA, when determining whether to approve Maryland's Attainment SIP, will continue to consider the overall sufficiency of the SIP, it has rendered its final decision as to the adequacy of the MVEB for conformity purposes. The action is therefore final for purposes of review under section 7607(b)(1). *See id.* ("Only if the EPA has rendered its last word on the matter in question is its action final and thus reviewable." (citation and internal quotation marks omitted)); *COMSAT Corp. v. National Sci. Found.*, 190 F.3d 269, 274 (4th Cir. 1999) ("[A]n agency action may be considered 'final' only when the action signals the consummation of an agency's decisionmaking process *and* gives rise to legal rights or consequences.").

BWI, however, contends that if the Petitioner is not challenging the legality of the adequacy regulations themselves, then the Petitioner must really be complaining about the EPA's announced intention to approve Maryland's Attainment SIP if Maryland complies with certain conditions, *see* 64 Fed. Reg. 70,397, which BWI contends is not a final action. In our view, BWI's characterization of the Petitioner's challenge is wide of the mark. As discussed above, the Petitioner seeks a reversal of the EPA's determination that the revised MVEB was adequate, a determination that is final and ripe for judicial review. While the Petitioner might also object to what appears to be the impending approval of the Attainment SIP, that objection does not prevent it from challenging the adequacy determination.

## C.

*Amicus* ASET contends that this case should be dismissed because the Petitioner lacks standing. We disagree.

"[A]n association may have standing to sue in federal court either based on an injury to the organization in its own right or as the representative of its members who have been harmed." *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 155 (4th Cir. 2000) (en banc). Representational standing is established if "(1) at least one of [the organization's] members would have standing to sue in his own right; (2) the organization seeks to protect interests germane to the organization's purpose; and (3) neither the claim asserted nor the relief sought requires the participation of individual

members in the lawsuit." *Id.*; *see Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977). The only real dispute in this case centers around the first prong of the inquiry—whether an individual member would have standing.

To establish "the irreducible constitutional minimum of standing," *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992), an individual plaintiff must demonstrate that:

> (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000).

The Petitioner and its members have an interest in preventing ill-conceived transportation projects from increasing the level of motor vehicle emissions pollution to which the members are exposed. According to the Petitioner, the EPA "approved" a motor vehicle emissions budget that is too high to allow Baltimore to reach attainment of the ozone NAAQS, thus opening the door to the construction of transportation projects that will prevent Baltimore from attaining the NAAQS and will subject the Petitioner's members to continued exposure to ozone above levels determined to be safe by the EPA. Although the transportation projects will not be built by the EPA, the EPA's determination that the revised MVEB was adequate was the act that was required before any transportation projects could be considered by other agencies, and it is the adequacy finding that will allow the construction of transportation projects that, according to the Petitioner, will prevent Baltimore from attaining the ozone NAAQS. *See Gaston Copper*, 204 F.3d at 154 ("The traceability prong means it must be likely that the injury was caused by the conduct complained of and not by the independent action of some third party not before the court."). And if the adequacy finding were to be set aside by this court, new transportation projects could not proceed until the development of a new and adequate MVEB, thus reducing the amount of

ozone pollution to which the Petitioner's members would be exposed. *See id.* at 162 ("The redressability requirement ensures that a plaintiff personally would benefit in a tangible way from the court's intervention" (internal quotation marks omitted)).

Given these circumstances, we conclude that the Petitioner has alleged a sufficiently concrete, imminent injury that is fairly traceable to the EPA's action and that can be redressed in this action. We therefore conclude that any one of the Petitioner's individual members would have standing to maintain an action in his own right and that the Petitioner thus has standing to bring this action. *See Natural Res. Def. Council v. EPA*, 25 F.3d 1063, 1067 (D.C. Cir. 1994) (concluding that environmental group with "members [who] live in communities subject to incidents resulting from mismanagement of used oil" has standing to challenge "the EPA's failure to list used oils as a hazardous waste" (internal quotation marks omitted)).

ASET, however, also contends that the doctrine of judicial estoppel should prevent the Petitioner from asserting that it has standing. After the Petitioner filed this petition for review, ASET sought permission from this court to intervene in the action. The Petitioner opposed the intervention, arguing, *inter alia*, that ASET lacked standing. From there ASET constructs the following argument: the Petitioner previously argued that ASET's interests were insufficient to confer standing; the Petitioner's interests in the case are even less concrete than ASET's interest; therefore, the Petitioner should be judicially estopped from arguing that its interests are sufficient to confer standing. We find this argument to be wholly without merit.

"Judicial estoppel precludes a party from adopting a position that is inconsistent with a stance taken in prior litigation. The purpose of the doctrine is to prevent a party from playing fast and loose with the courts, and to protect the essential integrity of the judicial process." *Lowery v. Stovall*, 92 F.3d 219, 223 (4th Cir. 1996) (internal quotation marks omitted). "Because the rule is intended to prevent improper use of judicial machinery, judicial estoppel is an equitable doctrine invoked by a court at its discretion." *New Hampshire v. Maine*, 121 S. Ct. 1808, 1815 (2001) (citation, brackets, and internal quotation marks omitted)).

Although "the circumstances under which judicial estoppel may appropriately be invoked are probably not reducible to any general formulation of principle, . . . several factors typically inform the decision whether to apply the doctrine in a particular case." *Id.* (citations and internal quotation marks omitted). In this circuit, we generally require the presence of the following elements before we will apply the doctrine of judicial estoppel:

> First, the party sought to be estopped must be seeking to adopt a position that is inconsistent with a stance taken in prior litigation. And the position sought to be estopped must be one of fact rather than law or legal theory.

> Second, the prior inconsistent position must have been accepted by the court. . . .

> Finally, the party sought to be estopped must have intentionally misled the court to gain unfair advantage.

*Lowery*, 92 F.3d at 224 (citations and internal quotation marks omitted); *accord Local Union 93, United Mineworkers of Am. v. Marrowbone Dev. Co.*, 232 F.3d 383, 390 (4th Cir. 2000).

Preliminarily, we note that the ultimate question of whether a party has standing is one of law, not fact. *See Fund for Animals v. Babbitt*, 89 F.3d 128, 132 (2nd Cir. 1996). Moreover, while this court denied ASET's motion to intervene (but granted it permission to participate as *amicus curiae*), the denial was not premised on a conclusion that ASET lacked standing, but instead on questions about the timeliness of the petition to intervene and a concern that allowing ASET to intervene would interfere with ongoing (but ultimately unsuccessful) settlement efforts. These factors demonstrate that the application of judicial estoppel would not be appropriate in this case. *See New Hampshire*, 121 S. Ct. at 1815 ("Absent success in a prior proceeding, a party's later inconsistent position introduces no risk of inconsistent court determinations and thus poses little threat to judicial integrity." (citation and internal quotation marks omitted)); *Lowery*, 92 F.3d at 224 ("The insistence upon a court having accepted the party's prior inconsistent position ensures that judicial estoppel is applied in the narrowest of circumstances."). Even without regard to these factors,

however, this case simply does not involve the type of inconsistent positions that the doctrine contemplates.

The Petitioner is an environmental group, while ASET is a coalition of various industries and business groups that derive economic benefit from the construction of transportation projects. To understate the obvious, the interests of environmental and business groups on opposite sides of environmental litigation generally are dissimilar; this case is no exception. The Petitioner's members claim injury from the approval and construction of transportation projects that they believe will cause an increase in the level of harmful ozone pollution in the Baltimore area. ASET's members, however, claim they will suffer economic injury if the construction of transportation projects is improperly delayed. There is nothing inconsistent or unfair about the Petitioner arguing (unsuccessfully) that ASET's interests are not sufficient to confer standing while at the same time arguing (successfully) that its own very different interests are sufficient to confer standing. Accordingly, we decline to apply the doctrine of judicial estoppel to prohibit the Petitioner from arguing that it has standing to bring this petition for review.

## D.

The last of the threshold questions about whether this court should entertain the petition for review is the EPA's waiver argument. The EPA insists that the Petitioner may not challenge the EPA's failure to require additional photochemical grid modeling because it did not raise that issue in its comments to the EPA. The EPA thus argues that the Petitioner has waived the right to raise the issue before this court.

"As a general matter, it is inappropriate for courts reviewing appeals of agency decisions to consider arguments not raised before the administrative agency involved." *Pleasant Valley Hosp., Inc. v. Shalala*, 32 F.3d 67, 70 (4th Cir. 1994); *see also Michigan Dep't of Envtl. Quality v. Browner*, 230 F.3d 181, 183 n.1 (6th Cir. 2000) (concluding that issues not raised during notice and comment period were waived for purposes of appellate review). Courts typically decline to consider issues not raised before an administrative agency because to do otherwise would "usurp[ ] the agency's function" and would "deprive the [agency] of an opportunity to consider the matter,

make its ruling, and state the reasons for its action." *Unemployment Comp. Comm'n v. Aragan*, 329 U.S. 143, 155 (1946); *see also United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952) ("Simple fairness . . . requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice."). Assuming this rule applies to this case,[7] we conclude that it does not bar the Petitioner's challenge.

We conclude that the comments made by the Petitioner sufficiently raised the question of whether additional modeling was required upon the submission of the revised MVEB. While the Petitioner's comments do not include a separately delineated section devoted to a claim that the revised MVEB cannot be approved without additional modeling and perhaps are phrased somewhat generally, the comments nonetheless refer (at least implicitly) to photochemical grid modeling three times, twice mentioning the process by name.[8] Although the

---

[7]In *City of Seabrook, Texas v. EPA*, 659 F.2d 1349 (Former 5th Cir. 1981), the court rejected the EPA's claim that the petitioner's failure to object to a conditional SIP approval during the notice-and-comment procedure prevented it from challenging the action in court:

> The rule urged by EPA would require everyone who wishes to protect himself from arbitrary agency action not only to become a faithful reader of the notices of proposed rulemaking published each day in the *Federal Register*, but a psychic able to predict the possible changes that could be made in the proposal when the rule is finally promulgated. This is a fate this court will impose on no one.

*Id.* at 1360-61 (footnote omitted). The court described as "badly misplaced" the EPA's reliance on cases like *L.A. Tucker Truck Lines*, which involved appeals by a party to an essentially adversarial administrative proceeding, where a hearing was held and evidence was received. *Id.* at 1361 n.17; *accord American Forest & Paper Ass'n v. EPA*, 137 F.3d 291, 295-96 (5th Cir. 1998). The waiver rule, however, has been rather routinely applied in cases similar to this one. *See, e.g.*, *Michigan Dep't of Envtl. Quality*, 230 F.3d at 183 n.1; *Military Toxics Project v. EPA*, 146 F.3d 948, 956-57 (D.C. Cir. 1998); *Natural Res. Def. Council*, 25 F.3d at 1073-74.

[8]*See* J.A. F-13 ("[T]he attainment year budget should be subjected to a photochemical grid modeling analysis, as required by the CAA, before

Petitioner stated in its comments that the modeling question would be "addressed more comprehensively" in other comments directed to another EPA action, this statement does not, as the EPA contends, suggest that the Petitioner was expressly declining to raise the issue in this action. Instead, the statement merely placed the EPA on notice that the issue would *also* be raised in connection with the other action. We therefore conclude that the Petitioner's comments sufficiently raised the question of whether additional modeling was required before the revised MVEB could be deemed adequate, and we now proceed to address the merits of this question.

IV.

The Petitioner's primary argument is that various provisions of the Clean Air Act unambiguously require a revision to a motor vehicle emissions budget to be supported by photochemical grid modeling or a similarly effective analytical method. The Petitioner therefore contends that the EPA violated the Clean Air Act by finding Baltimore's revised MVEB to be adequate for conformity purposes without requiring the performance of additional modeling. The EPA, however, contends that its actions were proper and not inconsistent with the commands of the Clean Air Act.

Final actions of the EPA under the Clean Air Act are reviewed according to the familiar standards of the Administrative Procedures Act, which requires us to uphold an agency action unless the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C.A. § 706(2)(A) (West 1996); *see Virginia v. Browner*, 80 F.3d 869, 876 (4th Cir. 1996) (applying the APA standard to the EPA's disapproval of a state implementation plan); *see also Sierra Club v. EPA*, 252 F.3d 943, 946-47 (8th Cir. 2001) (applying the APA standard to approval of a state implementation plan);

---

it is determined adequate for conformity purposes for the attainment year and beyond."); J.A. F-26 ("[T]he 2005 budget . . . must be analyzed with respect to the entire SIP in a photochemical grid modeling process, or its equivalent."); *Id.* ("The point here is that [Maryland] cannot . . . plow through the SIP revision process without fulfilling its legal obligation to conduct the analyses necessary to determine whether the proposed MVEBs will interfere with . . . attainment requirements.").

*Ober v. Whitman*, 243 F.3d 1190, 1193 (9th Cir. 2001) (applying the APA standard to the EPA's exemption in a federal implementation plan of certain "de minimis" sources of pollution). When determining whether the agency action is "in accordance with law," we defer to the agency's reasonable interpretation of the statute it administers "if the statute is silent or ambiguous with respect to the specific issue." *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984).

### A.

If the Petitioner is correct in asserting that EPA's action violated the plain language of the Clean Air Act, then the action of course must be aside under section 706(2)(A) of the APA. *See, e.g., Citizens Awareness Network, Inc. v. United States Nuclear Regulatory Comm'n*, 59 F.3d 284, 290 (1st Cir. 1995) (noting that review under the APA is narrow and that "agency decisions will be upheld so long as they do not collide directly with substantive statutory commands" (internal quotation marks omitted)); *cf. Chevron*, 467 U.S. at 842-43 (explaining that if "Congress has directly spoken to the precise question at issue," then "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress"). It is to this question that we now turn.

### (1)

The Petitioner first contends that, read together, sections 7410(a)(2)(I) and 7511a(c)(2)(A) of the Clean Air Act clearly require new modeling to be performed upon the submission of a revised MVEB. Section 7511a(c)(2)(A), which is found in "Part D" of the Act, is the provision that requires states with certain nonattainment areas to submit attainment demonstrations based on photochemical grid modeling. Section 7410(a)(2)(I) requires SIPs and SIP revisions for nonattainment areas to meet the requirements of Part D. *See* 42 U.S.C.A. § 7410(a)(2)(I) (stating that a "plan or plan revision for an area designated as a nonattainment area" must "meet the applicable requirements of part D of this subchapter (relating to nonattainment areas)"). The Petitioner argues that the MVEB is a critical component of an attainment demonstration and that, pursuant to section

7410(a)(2)(I), the revision of the budget thus required new modeling to be performed.

Although we harbor some doubt, we will assume for purposes of this opinion that the revision of the MVEB was a "plan revision" within the meaning of section 7410(a)(2)(I). Accepting this argument, however, does not require us to accept the Petitioner's ultimate argument that the EPA's adequacy determination in the absence of new modeling violated the Clean Air Act.

Section 7511a(c)(2)(A) requires attainment demonstrations to be supported by sufficient computer modeling, but it does not establish the time frame for that modeling. That is, the statute does not say that modeling must be performed within a certain number of days from the submission of the attainment SIP, nor does it say that *new* modeling must be performed in connection with every revision to an attainment SIP. Instead, it simply requires that the modeling demonstrate "that the plan, as revised, will provide for attainment of the ozone national ambient air quality standard" and that the demonstration be "based on photochemical grid modeling." 42 U.S.C.A. § 7511a(c)(2)(A). Nothing in this section prohibits the use of previously performed modeling if that modeling can show that the plan as revised will allow the area to reach attainment. *See, e.g.*, *Carbon Fuel Co. v. USX Corp.*, 100 F.3d 1124, 1133 (4th Cir. 1996) ("Under the most basic canon of statutory construction, we begin interpreting a statute by examining the literal and plain language of the statute.").

Since section 7511a(c)(2)(A) does not, as a matter of statutory construction, require the performance of *new* modeling upon the submission of any SIP revision (a requirement that is critical to the success of the Petitioner's claim), then section 7410(a)(2)(I) adds nothing to the mix. Section 7410(a)(2)(I) simply requires SIP revisions to comply with the applicable Part D requirements; it does not require that each of the Part D requirements must be performed anew with each SIP revision.

We are thus left with the conclusion that while section 7511a(c)(2)(A) requires SIPs and SIP revisions in certain nonattainment areas to demonstrate attainment through the use of photochemical grid modeling (or its equivalent), it does not prevent the use of

previously performed modeling to show attainment. Whether any such previously performed modeling in fact demonstrates attainment in any given case would be a question for the EPA to determine in the course of its review and approval (or disapproval) of the SIP or SIP revision. The reasonableness of *that* determination, however, is completely separate from the question of whether the Clean Air Act requires new modeling upon the revision of a SIP or any of its components.

(2)

The Petitioner also contends that its position is supported by the provisions of the Act regarding what is known as a "SIP call," the process by which the EPA notifies the states of deficiencies in submitted plans and directs the submission of revised plans. *See* 42 U.S.C.A. § 7410(k)(5); *see generally Clean Air Implementation Project v. EPA*, 150 F.3d 1200, 1207 (D.C. Cir. 1998). Under the EPA's general SIP call authority, the EPA may decide the extent to which the revision must satisfy the Act's SIP requirements. *See* 42 U.S.C.A. § 7410(k)(5) ("Any finding [of plan inadequacy] under this paragraph shall, *to the extent the Administrator deems appropriate*, subject the State to the requirements of this chapter to which the State was subject when it developed and submitted the plan for which such finding was made . . . ." (emphasis added)). Revisions submitted in response to SIP calls in nonattainment areas, however, "must correct the plan deficiency (or deficiencies) specified by the Administrator and meet all other applicable plan requirements of section 7410 of this title and this part." 42 U.S.C.A. § 7502(d).

The Petitioner argues that since revisions to a plan in a nonattainment area after a SIP call must meet all other applicable requirements, including the Part D requirements, then the EPA's requirement that Maryland revise the MVEB must likewise be understood to trigger the Part D requirements. This argument, however, does not help the Petitioner, because, as we have explained, the Part D modeling provision does not require that *new* modeling be performed every time there is a revision to a SIP.

(3)

The Petitioner also contends that the conformity provisions of the Act require that conformity determinations be made by reference to

an approved SIP. Because the revised MVEB is part of a submitted, but not yet approved, SIP revision, the Petitioner contends that the adequacy determination, which allows the budget to be used for conformity purposes, violates the requirement that conformity be based on an approved SIP. We disagree.

To be sure, the conformity provisions of the Clean Air Act do appear to contemplate that conformity determinations will be made with regard to approved plans. *See* 42 U.S.C.A. § 7506(c)(1) (prohibiting federal agency from approving or supporting "any activity which does not conform to an implementation plan after it has been approved"); *id.* § 7506(c)(2) ("No Federal agency may approve, accept or fund any transportation plan, program or project unless such plan, program or project has been found to conform to any *applicable implementation plan . . . .*" (emphasis added)); *id.* § 7602(q) (defining "applicable implementation plan" as "the portion (or portions) of the implementation plan, or most recent revision thereof, *which has been approved* under section 7410 of this title" (emphasis added)). That the statute seems to contemplate the use of approved plans, however, does not resolve the question.

Although the phrase "motor vehicle emissions budget" is not used in the conformity provisions, it is nonetheless clear that to comply with section 7506(c), conformity determinations must be based on those budgets. *See* 42 U.S.C.A. § 7506(c)(2)(A) (requiring consistency with "estimates of emissions from motor vehicles and necessary emissions reductions contained in the applicable implementation plan"); *id.* § 7506(c)(2)(D) (explaining that certain transportation projects will be found to conform only if, *inter alia*, the project "do[es] not cause such plans and programs to exceed the emission reduction projections and schedules assigned to such plans and programs in the applicable implementation plan"). Not all SIPs, however, contain motor vehicle emissions budgets. Generally, only those SIPs that the EPA refers to as "control strategy" SIPs—attainment demonstration SIPs and "reasonable further progress" SIPs—contain sufficiently quantified MVEBs. *See* 40 C.F.R. § 93.101 (defining "motor vehicle emissions budget" as "that portion of the total allowable emissions defined in the submitted or approved control strategy implementation plan revision . . . for a certain date for the purpose of meeting reasonable further progress milestones or demonstrating attainment

. . . of the NAAQS for any criteria pollutant or its precursor, allocated to highway and transit vehicle use and emissions"); *id.* (defining "control strategy implementation plan revision" as "the implementation plan which contains specific strategies for controlling the emissions of and reducing ambient levels of pollutants in order to satisfy CAA requirements for demonstrations of reasonable further progress and attainment").

In addition, while the Clean Air Act required SIP revisions demonstrating attainment and reasonable further progress to be submitted by November 15, 1994, *see* 42 U.S.C.A. § 7511a(c)(2), many states were unable to meet this deadline because of problems caused by "ozone transport." *See* 64 Fed. Reg. at 70,398; *see also Virginia v. EPA*, 108 F.3d 1397, 1400 (D.C. Cir. 1997) (explaining that ozone transport is a process through which precursor emissions and ozone-laden air from one area move downwind, thus contributing to the ozone problems of another area). Because of these problems, the EPA ultimately extended until April 1998 the deadline for serious and severe nonattainment areas to submit their attainment demonstrations. *See* 64 Fed. Reg. at 70,398.[9]

Because not all SIPs contain MVEBs and because of the delay in the submission and approval of attainment demonstrations that do contain such budgets, it is entirely possible that some nonattainment areas subject to the conformity requirements may not have in place an approved SIP containing a MVEB. While the Clean Air Act generally contemplates that conformity determinations will be made by reference to approved SIPs, the Act simply does not address how conformity determinations should be made in the absence of an approved SIP with an adequate motor vehicle emissions budget. *See Environmental Def. Fund v. EPA*, 167 F.3d 641, 650 (D.C. Cir. 1999) (recognizing that section 7506 does not "dictate[ ] how conformity should be determined" if "no approved SIP exists or [if] the approved SIP contains no adequate motor vehicle emissions budget"). It there-

---

[9]Maryland submitted its Attainment SIP for Baltimore in accordance with this extended deadline, and it is this Attainment SIP that contains the motor vehicle emissions budget at issue in this case. As of the time of this writing, the EPA has yet to approve the Attainment SIP, although it anticipates taking action by October 2001.

fore cannot be said that the EPA's reliance in this case upon a submitted but not yet approved MVEB is inconsistent with the requirements of section 7506(c).[10]

(4)

The Petitioner also contends that finding the revised MVEB to be adequate without requiring additional modeling is inconsistent with those portions of the Clean Air Act governing the EPA's approval and partial approval of SIP revisions. *See* 42 U.S.C.A. § 7410(l) ("The Administrator shall not approve a revision of a plan if the revision would interfere with any applicable requirement concerning attainment and reasonable further progress . . ., or any other applicable requirement of this chapter."); 42 U.S.C.A. § 7410(k)(3) (authorizing the EPA to approve a portion of a plan revision if that portion "meets all the applicable requirements of this chapter"). As we understand the Petitioner's argument, it suggests that the adequacy finding is the functional equivalent of an approval (or perhaps a partial approval) of a SIP revision, which requires compliance with all of the Act's SIP requirements, including the Part D photochemical grid modeling requirement.

Preliminarily, we note that sections 7410(k)(3) and 7410(l) refer to approval of SIP revisions, and we question whether an adequacy finding regarding a revised motor vehicle emissions budget amounts to approval of a SIP revision. Nonetheless, even if the adequacy finding should be treated as the functional equivalent of an approval, whether such approval could be granted absent new photochemical grid modeling is again dependent on the scope of section 7511a(c)(2)(A)'s

---

[10]The Petitioner insists that it is not challenging the validity *vel non* of the EPA's regulations governing the use and adequacy of submitted motor vehicle emissions budgets. Therefore, even if it would be proper for us to consider the reasonableness of these regulations, *see* 42 U.S.C.A. § 7607(b)(1) (requiring challenges to nationally applicable regulations to be brought in the D.C. Circuit within 60 days after notice of promulgation); *but see Illinois Envtl. Prot. Agency*, 947 F.2d at 289-92 (considering the validity of certain Clean Air Act regulations even though the action was commenced several years after the regulations were promulgated), we do not address the issue.

modeling requirement. As discussed above, while section 7511a(c)(2)(A) requires an attainment demonstration to be supported by modeling, the statute does not address whether new modeling must be performed any time any portion of an attainment SIP is revised while awaiting approval by the EPA. Thus, the EPA's "approval" of the revised MVEB without requiring new modeling is not inconsistent with section 7410(k)(3) or section 7410(l).

(5)

In sum, we conclude that nothing in the Clean Air Act requires that *new* photochemical grid modeling be performed when a motor vehicle emissions budget in a submitted SIP is revised or before the revised budget may be found adequate for conformity purposes. We therefore cannot say that the EPA's action was "not in accordance with law." 5 U.S.C.A. § 706(2)(A). The question, then, is whether the EPA's action can otherwise be considered arbitrary or capricious.

B.

The Petitioner appears to challenge as arbitrary and capricious the EPA's decision that new modeling was not necessary upon revision of the MVEB, as well as the EPA's determination that the revised MVEB was adequate for conformity purposes. We address these claims in turn.

(1)

We first consider whether the EPA acted arbitrarily or capriciously when it concluded that new photochemical grid modeling was not necessary upon the submission of the revised MVEB. To address this argument we must explain the action taken by the EPA on Baltimore's submitted Attainment SIP.

When reviewing the Attainment SIP, the EPA found the initial MVEB inadequate, and the EPA proposed to approve the Attainment SIP only if Maryland took certain actions. First, the EPA concluded that "additional emission reductions beyond those provided by the SIP submission are necessary for attainment." 64 Fed. Reg. at 70,403. Part

of those emissions reductions would be realized through the implementation of the national "Tier 2/Sulphur" program, which was not addressed in the SIP submission. The EPA therefore required Maryland to revise the Attainment SIP submission and MVEB to reflect those reductions. *See id.* The EPA also stated that the revised MVEB must reflect the effects of other control measures, such as the "low emissions vehicle program," which were assumed in the modeling. *Id.* at 70,409. Second, the EPA required Maryland to commit to revise its MVEB within one year after the EPA's release of "MOBILE6," a model used for estimating mobile source emissions. *See id.* at 70,403, 70,410. Third, the EPA concluded that, even considering the Tier 2/Sulphur reductions, Baltimore would not achieve attainment without the application of additional emission control measures. *See id.* Thus, the EPA required Maryland to identify potential control measures and to submit an enforceable commitment to implement the measures necessary to reduce emissions to a level consistent with attainment. *See id.* at 70,404, 70,410. Fourth, the EPA required Maryland to submit "adopted control measures consistent with the [nitrogen oxides] reductions assumed in the attainment demonstration." *Id.* at 70,409. Finally, the EPA required Maryland to commit to performing a "mid-course review," which is "a reassessment of modeling analyses and more recent monitored data to determine if a prescribed control strategy is resulting in emission reductions and air quality improvements needed to attain the ambient air quality standard for ozone as expeditiously as practicable but no later than the statutory dates." *Id.* at 70,405.

Notwithstanding these deficiencies in the submitted SIP, the EPA did find that the computer modeling contained in the submitted SIP was adequate, even though the modeling showed ozone concentration levels in excess of attainment levels. The EPA has long recognized that there are "uncertainties inherent in available models and in estimating future emissions." *EPA Guidance on Use of Modeled Results to Demonstrate Attainment of the Ozone NAAQS*, J.A. W7. The EPA thus allows the use of supplemental analysis, including a "weight of evidence" analysis, to demonstrate attainment in cases where the modeling shows ozone levels exceeding the NAAQS. If the weight of evidence approach "leads to compelling evidence that attainment is likely," J.A. W7, then the EPA will conclude that attainment has been demonstrated even if the modeled levels are too high. However, the

EPA guidance notes that "the further [modeling] results are from passing the test, the more difficult it is to develop compelling supplementary evidence that attainment is likely." *Id.*

As to the modeling for Baltimore, the EPA determined that the modeling actually over-predicted ozone levels. *See* 64 Fed. Reg. at 70,407. After accounting for the over-prediction, the EPA concluded that the modeling showed ozone levels that were "close enough to attainment to warrant the consideration of weight-of-evidence arguments that support the demonstration of attainment." *Id.* After applying the weight-of-evidence analysis, the EPA concluded that the modeling demonstrated "that it is likely the Baltimore area will attain the 1-hour ozone standard by the statutory date of 2005," *id.*, so long as Maryland committed to adopting additional control measures, as previously discussed.

Because the EPA considered the effects of the additional control measures it was requiring when it analyzed the submitted modeling, the EPA determined that new modeling was not needed:

> The EPA is not requesting that States[11] perform new photochemical grid modeling to assess the full air quality impact of the additional measures that would be adopted. Rather, as described above, one of the factors that EPA can consider as part of the [weight of evidence] analysis of the attainment demonstration is whether there will be additional emission reductions anticipated that were not modeled. Therefore, EPA will consider the reductions from these additional measures as part of the [weight of evidence] analysis if the State adopts the measures or, as appropriate, submits an enforceable commitment to adopt the measures.

64 Fed. Reg. at 70,403-04.

Except for the already rejected argument that the Clean Air Act explicitly requires new modeling upon the revision of a SIP, the Peti-

---

[11]Although the EPA in this document focused most specifically on Baltimore's submitted Attainment SIP, it also addressed the submissions of other states.

tioner offers no concrete argument as to why it was improper for the EPA to conclude that new modeling was not necessary. While there may be cases where previously performed modeling is inadequate to demonstrate attainment such that the EPA's failure to require new modeling in those cases might be found to be arbitrary or capricious, this is not such a case.

As explained, the EPA factored into its analysis of the sufficiency of the existing modeling the effects of the SIP revisions that it was requiring. Because the modeling sufficiently demonstrated attainment when those revisions were considered, the EPA rationally concluded that new modeling was not necessary. *See Chevron*, 467 U.S. at 843 ("The power of an administrative agency to administer a congressionally created program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." (ellipsis and internal quotation marks omitted)). We cannot say the EPA made a clear error of judgment when reaching this conclusion. *See Hughes River Watershed Conservancy v. Johnson*, 165 F.3d 283, 287 (4th Cir. 1999) ("When reviewing an agency's decision to determine if that decision was arbitrary and capricious, . . . we look only to see if there has been a clear error of judgment." (internal quotation marks omitted)); *Natural Res. Def. Council, Inc. v. EPA*, 16 F.3d 1395, 1401 (4th Cir. 1993) ("[T]his court's task is to scrutinize the EPA's activity to determine whether the record reveals that a rational basis exists for its decision." (internal quotation marks omitted)).

(2)

The Petitioner also challenges the substantive adequacy finding, contending that without new modeling, the EPA's determination that the revised MVEB was adequate for conformity purposes was pure speculation, not grounded on any reliable information. We disagree.

When the EPA found the revised MVEB adequate for conformity purposes, it did so pursuant to the "adequacy criteria" contained in 40 C.F.R. § 93.118(e)(4)(i)-(vi). The adequacy criteria provide, in pertinent part, that:

> EPA will not find a motor vehicle emissions budget in a
> submitted control strategy implementation plan revision or

maintenance plan to be adequate for transportation confor-
mity purposes unless the following minimum criteria are
satisfied:

. . .

(iii) The motor vehicle emissions budget(s) is clearly
identified and precisely quantified;

(iv) The motor vehicle emissions budget(s), when consid-
ered together with all other emissions sources, is consistent
with applicable requirements for reasonable further prog-
ress, attainment, or maintenance (whichever is relevant to
the given implementation plan submission);

(v) The motor vehicle emissions budget(s) is consistent
with and clearly related to the emissions inventory and the
control measures in the submitted control strategy imple-
mentation plan revision or maintenance plan . . . .

40 C.F.R. § 93.118(e)(4).[12]

Even though the revised MVEB was higher than the one originally
found to be inadequate, the EPA determined that the revised budget,
when considered with the emissions reduction programs in place and
when considered with Maryland's enforceable commitment to imple-
ment all other control measures necessary to reach attainment, was
consistent with attainment. The EPA considered whether the revised
MVEB was consistent with the targeted emissions levels for the mile-
stone years established by Baltimore's "reasonable further progress"
demonstration. While the revised budget was consistent with the tar-
get levels for the year 2002, the EPA noted that it exceeded the 2005
target level for the emissions of volatile organic compounds
("VOCs"). However, because Baltimore's SIP included control mea-

_____

[12]Certain portions of the EPA's conformity regulations were found to
be inconsistent with the requirements of the Clean Air Act by the D.C.
Circuit and were remanded to the Agency. *See Environmental Def. Fund*,
167 F.3d at 651. No portion of the adequacy criteria quoted above were
affected by that decision.

sures that would bring the levels of nitrogen oxides ("NOx") below the target NOx level, Baltimore could use the surplus of NOx control as a substitute for VOC control. Such substitution is permitted by the Clean Air Act, *see* 42 U.S.C.A. § 7511a(c)(2)(C), and the EPA concluded that with the substitution, the revised MVEB was consistent with Baltimore's 2005 "reasonable further progress" target. In addition, the EPA noted that when submitting the revised budget, Maryland reaffirmed its commitment to adopt all control measures necessary to reach attainment, as required by the EPA, and Maryland also committed to adopt any additional control measures necessary to offset the increase in emissions caused by the use of the updated fleet information. The EPA thus concluded that the revised budget satisfied the requirements of the adequacy regulations, specifically finding that the revised budget, when considered with all other emissions reductions, was consistent with attainment.

The Petitioner again offers no concrete argument to show the fallacy of this determination, except the conclusory assertion that new modeling is the only way to effectively determine whether the revised MVEB is consistent with attainment. As discussed above, the EPA thoroughly analyzed the modeling performed in connection with the submitted Attainment SIP, and the EPA carefully analyzed the effect of the revised budget submitted by Maryland. After this careful analysis, the EPA determined that the revised budget was consistent with attainment, a determination that complied with the general requirements of the conformity provisions of the Clean Air Act and with the requirements of the EPA's adequacy regulations. *See Natural Res. Def. Council*, 25 F.3d at 1073 ("An agency seldom acts arbitrarily when it acts in conformity with its unchallenged rules."). In our view, the conclusion that the revised budget was consistent with attainment was not speculative but instead was based on a reasoned analysis of the information before the EPA. Under these circumstances, we cannot conclude that the EPA acted arbitrarily or capriciously when finding the revised MVEB to be adequate for conformity purposes. *See Steel Mfrs. Ass'n v. EPA*, 27 F.3d 642, 646 (D.C. Cir. 1994) (per curiam) ("In assessing whether agency decisions are arbitrary and capricious, we afford the agency significant leeway. We do not substitute our judgment for that of the agency; we require only that the agency's decisions reflect reasoned decisionmaking based on evidence in the record."); *cf. Baltimore Gas & Elec. Co. v. Natural Res.*

*Def. Council, Inc.*, 462 U.S. 87, 103 (1983) ("[A] reviewing court must remember that the [agency] is making predictions, within its area of special expertise, at the frontiers of science. When examining this kind of scientific determination, as opposed to simple findings of fact, a reviewing court must generally be at its most deferential.").

The Petitioner, however, contends that the EPA erred by finding the revised MVEB adequate since the revised budget was higher than the previous budget found to be inadequate. The Petitioner claims that any increases in motor vehicle emissions must be offset by reductions in other mobile source emissions, so that the EPA's reliance on Maryland's commitment to adopt non-mobile source control measures was improper. We find this argument to be without merit.

The Petitioner's argument is premised on 42 U.S.C.A. § 7511a(c)(5)(A), which states:

> Beginning 6 years after November 15, 1990, and each third year thereafter, the State shall submit a demonstration as to whether *current* aggregate vehicle mileage, aggregate vehicle emissions, congestion levels, and other relevant parameters are *consistent with those used for the area's demonstration of attainment*. Where such parameters and emissions levels exceed the levels projected for purposes of the area's attainment demonstration, the State shall within 18 months develop and submit a revision of the applicable implementation plan that includes a transportation control measures program consisting of measures from, but not limited to, section 7408(f) of this title that will reduce emissions to levels that are consistent with emission levels projected in such demonstration. . . .

42 U.S.C.A. § 7511a(c)(5)(A) (West 1995) (emphasis added). Section 7511a(c)(5)(A) simply provides that once a state has established a budget for motor vehicle emissions through an attainment demonstration, then the state must periodically monitor actual emissions. If the actual emissions exceed the budgeted emissions, the state must offset those exceedances with reductions from the transportation sector. In this case, however, while the EPA has found the revised MVEB to be adequate for conformity purposes, it has yet to formally approve Bal-

timore's attainment SIP. Once the Attainment SIP is approved, then actual emissions can be measured against the attainment budget. If the actual emissions exceed the budgeted level, only then does section 7511a(c)(5)(A) come into play and require the adoption of transportation control measures. Thus, the EPA's failure to require transportation control measures does not serve as a basis to invalidate the agency's adequacy finding.

C.

After carefully considering the arguments raised by the Petitioner, we cannot conclude that the EPA acted in a manner inconsistent with the language of the Clean Air Act when it did not require the performance of additional photochemical grid modeling upon submission of the revised MVEB or when it allowed a submitted but not approved budget to be used for conformity purposes. Likewise, we cannot conclude that the EPA otherwise acted arbitrarily or capriciously when it decided that new modeling was not necessary or when it determined that the revised budget was adequate for conformity purposes.

V.

The Petitioner's final argument is that the EPA violated the APA by not sufficiently explaining its basis and purpose when finding the revised MVEB to be adequate. *See* 5 U.S.C.A. § 553(c) (requiring the agency in certain proceedings to "incorporate in the rules adopted a concise general statement of their basis and purpose"). The Petitioner contends that this failure requires us to set aside the adequacy finding. Although the EPA contends that the basis-and-purpose requirement does not apply to the adequacy determination, which the EPA characterizes as an "informal adjudication," we need not decide that question. Assuming that the basis-and-purpose requirement applies to adequacy determinations, we find that the EPA sufficiently explained its actions.

To satisfy the basis-and-purpose requirements of the APA, the agency need not provide

> an exhaustive explanation of an administrator's reasoning
> for adopting a rule. Required is a concise general statement

of the regulation's basis and purpose. There is no obligation to make references in the agency explanation to all the specific issues raised in comments. The agency's explanation must simply enable a reviewing court to see what major issues of policy were ventilated by the informal proceedings and why the agency reacted to them the way it did.

*South Carolina ex rel. Tindal v. Block*, 717 F.2d 874, 886 (4th Cir. 1983) (citations, alterations, and internal quotation marks omitted). While an "agency must examine the relevant data and articulate a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made," courts will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted).

As discussed above, the EPA in the document finding Baltimore's initial MVEB to be inadequate explained why additional modeling was not necessary. And in its "Technical Support Document," the EPA explained why it believed the revised MVEB was adequate for conformity purposes. Although the explanations may not have been as detailed as the Petitioner would have liked, we nonetheless conclude that through these documents the EPA adequately addressed the somewhat general comments of the Petitioner and sufficiently explained the basis and purpose of its actions. *See Reytblatt v. United States Nuclear Regulatory Comm'n*, 105 F.3d 715, 722-23 (D.C. Cir. 1997) ("Although the NRC did not directly respond to Dr. Reytblatt's suggested alternatives . . ., its explanation was adequate in light of the general nature of Dr. Reytblatt's comments . . . ."); *National Recycling Coalition, Inc. v. Browner*, 984 F.2d 1243, 1252 (D.C. Cir. 1993) (holding that the EPA's explanation in five different documents of its interpretation of a specific statutory provision satisfied the APA's basis-and-purpose requirement).

VI.

To summarize, we conclude that nothing in the Clean Air Act expressly requires the submission of *new* photochemical grid modeling upon the revision of a motor vehicle emissions budget contained in a submitted attainment SIP. We also conclude that the EPA did not

act arbitrarily or capriciously when it declined to require new modeling in conjunction with the revision of Baltimore's motor vehicle emissions budget or when it found the budget to be adequate for conformity purposes. And because the EPA sufficiently explained the basis and purpose of its actions, we decline to set aside the adequacy determination. Accordingly, the petition for review is hereby denied.

*PETITION DENIED*